No. 26,964.

L. W. KEPLINGER and THOMAS CAREY, *Appellees*, v. THE CITY OF KANSAS CITY et al., *Appellants*.

SYLLABUS BY THE COURT.

MUNICIPAL CORPORATIONS—*Limitations on Bonded Indebtedness—Waterworks Bonds—Construction of Statute*. In the statutory provision that city bonds for waterworks or like utilities shall be disregarded in determining whether the limit (ten per cent of the assessed valuation) of permissible bonded indebtedness has been reached, so as to prevent the further issuance of "bonds for general purposes" the phrase quoted refers to bonds which are a charge against the taxpayers generally as distinguished from those for improvements the cost of which is charged to the property specially benefited. Therefore in determining whether the limit for the issuance of paving bonds has been reached waterworks bonds are to be counted.

Appeal from Wyandotte district court, division No. 2; FRANK D. HUTCHINGS, EDWARD L. FISCHER, WILLIAM H. McCAMISH and CHARLES A. MILLER, judges. Opinion filed December 11, 1926. Affirmed.

*William Drennan, James F. Getty* and *David F. Carson,* all of Kansas City, for the appellants.

*C. W. Trickett, Fred Robertson, E. M. Boddington,* all of Kansas City, and *Charles L. Carr,* of Kansas City, Mo., for the appellees; *L. W. Keplinger,* of Kansas City, *pro se.*

*Charles B. Griffith,* attorney-general, *W. C. Ralston,* assistant attorney-general, *Thomas E. Elcock, James G. Martin, Harold H. Malone,* all of Wichita, *Blake A. Williamson, Thomas A. Pollock,* both of Kansas City, *Justin D. Bowersock, Robert B. Fizzell* and *John F. Rhodes,* all of Kansas City, Mo., as *amici curiæ.*

The opinion of the court was delivered by

MASON, J.: The city commissioners of Kansas City, Kan., entered upon a project for the paving of a street. Abutting owners brought an action to enjoin them from carrying it out on the ground that for various reasons the statutes did not permit it. The case was heard by the four judges of the district court and a permanent injunction was granted. The defendants appeal.

The plan adopted by the defendants involves the issuance of bonds for the paving, the cost to be met by assessment against the abutting property. One of the objections made is that the city has already issued bonds to such an amount as to exceed the limit fixed

Constitutional Law, 12 C. J. p. 780 n. 98. Municipal Corporations, 28 Cyc. p. 1583 n. 6.

Keplinger v. Kansas City.

by law, and having exhausted its capacity in that regard cannot lawfully issue those necessary to the carrying out of the paving project. The soundness of this objection depends upon whether bonds issued for a city waterworks and light plant are to be included in computing the ten per cent of the assessed valuation which is the limit placed by the statute upon the total amount of bonds the city may issue. This turns upon the interpretation of the statute—specifically upon what is meant by the phrase "for general purposes" in an act providing that bonds for utilities (such as waterworks) shall not be taken into account in determining the limit of the city's power to issue bonds for "general purposes." The plaintiffs contend that "general purposes" refers to expenses the burden of which falls upon the city as a whole and not upon the owners of property specially benefited. The defendants assert that "general purposes" refers to all public improvements other than utilities (such as waterworks and electric-light plants), regardless of whether the ultimate cost falls on the general taxpayer or on the owners of property specially benefited.

The assessed valuation of all the property in the city for 1923, the year directly involved, was $121,380,689; for 1924 it was $128,-985,288. The bonded indebtedness of the city is thus stated in the findings:

"General bonds ................................... $4,256,996.90
Special improvement bonds ...................... 4,394,872.00
Water and light bonds ......................... 6,274,500.00

Making a total outstanding bonds............. $14,926,368.90"

Obviously, therefore, if the plaintiffs are right in their contention that water and light bonds are to be counted, the limit of 10 per cent has already been exceeded and the city is without authority to issue the bonds in question; while if these bonds are not to be taken into account there is a margin of some three and a half million dollars.

The following is the section of the statute requiring to be interpreted, the part introduced by the second *"Provided further"* having been added by amendment in 1919, without other change:

"At no time shall the bonded indebtedness of any city of the first class having a population of fifty thousand or more, except for bonds issued for special improvements and for sewers, for which a special tax is levied upon the property improved, exceed five per cent of the assessed value of all the taxable property within said city, as shown by the assessment books of the previous year; and at no time shall the bonded indebtedness of any city of the first class

having a population of fifty thousand or more, including bonds issued for special improvements, for which a special tax is levied upon the property improved, exceed ten per cent of the assessed value of all the taxable property within said city, as shown by the assessment books of the previous year: *Provided further,* That nothing in this act shall be construed to impair or invalidate any bonds already issued, whether for general purposes or for special improvements, or bonds to pay for improvements already legally petitioned for: *Provided further,* That in all cities now owning or which may hereafter acquire a public utility of any kind, such as waterworks, electric-light plant or other like utility, the bonds issued by the city to acquire, enlarge, extend or improve any such utility shall not be taken into account or in any way limit the city's right to issue bonds for general purposes or impair the city's debt-making power for general purposes as provided for in this section; and bonds for general purposes may be issued by the city to the same extent as though no utility bonds had been issued." (R. S. 10-302.)

We agree with the conclusion of the district court that the phrase "general purposes" as used in the section quoted refers to bonds issued for improvements the cost of which falls on the city taxpayers generally, as distinguished from those issued for improvements the expense of which is met by assessments against the property specially benefited. This seems to us the natural construction, as according with the sense in which such expressions are commonly used. That, however, is far from conclusive, for a different meaning might readily be attached if required by other considerations. A stronger reason is that the original portion of the section of which the amendment is made a part is largely based on the distinction between these two classes of improvements, and bonds already issued or petitioned for are excepted from its operation, "whether for general purposes or for special improvements," the term "general purposes" being employed obviously with this very distinction in mind. Moreover the added portion of the statute describes the character of bonds, the limit on the issuance of which is to be computed without regard to utilities bonds, as those issued "for general purposes as provided for in this section." "This section" clearly refers to the entire section as amended and not merely to the new portion. The history of the statute tends to confirm this view of its meaning. In 1917 a proposition was on foot in Kansas City to issue bonds to the amount of $125,000 to build an addition to the city hall. In November of that year this court held, overruling the district court, that outstanding waterworks bonds had to be taken into account in determining whether the five-per-cent limit would be exceeded, and the issuance of the new bonds was for this reason

enjoined. (*State, ex rel., v. Kansas City*, 101 Kan. 806, 168 Pac. 907.) The amendment of 1919, now under consideration, was the result of a bill introduced by the senator from Wyandotte county, which it seems probable was suggested by the decision referred to. If so its purpose would seem to have been to enlarge the right of the city to issue general bonds in the sense of bonds the ultimate payment of which falls upon taxpayers generally and not upon the owners of property specially benefited. The force of this suggestion may be somewhat weakened, however, by the fact that at the same session, but some six weeks later, another bill was introduced in the senate which became a law, the two bills being voted on in the house on the same day, authorizing cities having a population of more than 85,000, and an assessed valuation of over $90,000,000, to issue city hall bonds without restrictions and upon a past election. (R. S. 13-1067.)

Moreover the bill in which the statute under consideration originated was at first drawn as a separate enactment, and read as follows:

"That all bonds heretofore or hereafter issued by any city of the first or second class for the purpose of acquiring, enlarging, extending or improving any public utility such as waterworks, light plants, ice plants or any other public utility shall not be a limitation upon the power of the city to issue bonds for any other purpose."

This bill was referred to the committee on cities of the first class, which reported favorably a substitute in the form of an amendment to the existing statute, which was duly passed, and is the section now under discussion. It will be noted that if the section above quoted from the bill as introduced had been added to the then existing law as an independent enactment the results would have been to bring about clearly and definitely the condition which the defendants claim now exists. Instead, however, of making the change first proposed, either by a separate bill or as an amendment, the legislature saw fit to enact the present law. The so-called substitute was in effect an amendment to the original bill, proposed by the senate committee and adopted by the senate. This feature of the legislative history of the statute would not warrant giving it a meaning not found in its language, but is not without value as tending to confirm the view that the meaning expressed was that intended. The language was changed so as to fit into the statute as already framed, and the enlargement of the right to create bonded indebtedness in-

stead of being made applicable, as in the first draft, to bonds "for any other purpose" (than waterworks and like utilities) was limited to "bonds for general purposes," so that the restriction removed was that upon the power to incur debt "for general purposes as provided for in this section."

In behalf of the defendants attention is called to a rule of the senate that "no substitute shall be made for any bill which changes the subject matter of the bill under consideration." The argument is made that the power of the committee was "to substitute one proposal for another, provided it made no material change in the bill." It is also suggested that if the substitute differed materially from the original bill it was not validly enacted, because it was not read three times in the senate. For which reasons it is urged that the substitute should be interpreted as of the same effect as the original bill. We regard the prohibition against a change of the subject matter as meaning merely that the substitute shall relate to the same general subject—not that no material changes may be made. The substitute being, as already noted, in effect an amendment of the original bill, it seems reasonable to regard the bill as having been read three times, as shown by the record. But if necessary to a valid enactment the presumption would doubtless be indulged that an additional reading was had, or an emergency declared, although the journal was silent on the subject. (*Weyand v. Stover*, 35 Kan. 545, 553, 11 Pac. 355; *Railway Co. v. Simons*, 75 Kan. 130, 88 Pac. 551.)

In the defendants' reply brief it is said with respect to the change from the original to the substitute bill: "As a matter of fact senate bill No. 46 . . . was the bill that the legislature intended to enact. It passed its second reading in the senate, and was garbled, while in the senate committee of first class cities, by some person in that committee, who attempted to attach it to the old 1909 law as an amendment, and the senate believing that its provisions were unchanged and that it had properly been attached to the old law, accepted the substitute bill, which it passed for the purpose of exempting utility bonds from limiting the power of cities of the first class to issue bonds for any other purpose." The court is bound, however, by the enrolled bill, the due enactment of which is open to attack only by affirmative and conclusive recitals of the journals, and the language of which is what we are required to interpret.

The defendants invoke the doctrine of statutory construction that

Keplinger v. Kansas City.

where an amendment is made by an addition to an existing section, the original matter is ordinarily conceived as having been the law all the time, rather than as being a new enactment. An effort is made to extend this principle so that it shall include a rule that the new matter shall be interpreted as though it were an independent act, implying (as we understand the contention) that the language of the original section is not available to throw light on the meaning of that employed in the added part, as would be the case if the entire section had been enacted as a whole in the first instance. The accepted doctrine referred to is of value, for instance, in determining as of what time a statute is regarded as speaking, or which of two conflicting provisions shall control as the later enactment. We do not think it can be enlarged to the extent indicated, especially where, as in the instance at hand, a change originally drafted as an independent measure was later incorporated into an existing section, with very considerable alterations.

A further argument is based upon the view that the following part of the statute is merely interpretative and explanatory and should not be regarded as intended to make a distinction between "bonds for general purposes" and "bonds for special improvements":

*"Provided further,* That nothing in this act shall be construed to impair or invalidate any bonds already issued, whether for general purposes or for special improvements, or bonds to pay for improvements already legally petitioned for."

To us the language quoted, whether or not it adds to the substantive part of the statute, seems important as showing the distinction in the mind of the legislature between the two classes of bonds, and the language employed in distinguishing them from each other.

A number of matters are urged as reasons for departing from a literal interpretation of the statute, in order to give it the effect contended for by the defendants. Among them are these: The general policy of the legislature as shown by other statutes is in harmony with the interpretation of the defendants rather than that of the plaintiffs, as shown for instance by a statute of 1919 authorizing cities of more than 85,000 inhabitants to operate a coal mine to obtain coal for use in connection with city utilities, issuing bonds for the purpose without any restrictions whatever. (R. S. 13-1461 to 13-1469.) The statute under consideration, and others as well, show a purpose to impose a closer restriction upon bond issues which

place the burden of payment upon the taxpayers of the city generally than upon those to be met by assessments on the property specially benefited, and a contrary intention should not be attributed to the legislature if it can be avoided by any permissible interpretation. Bonds to considerable amounts have already been issued which are in excess of the statutory limit, if the plaintiffs' construction of it is correct, some of them being held by the state. This involves an administrative interpretation in favor of the defendants' views, which should be given weight by the court.

It is true plausible reasons may be given why the creating of bonded indebtedness should be more closely limited where payment is to be made by the general public than where the cost is to fall upon property specially benefited, and a prevailing legislative policy to that effect may be discoverable. But whether at a given time in a general statute of restricted scope, presently applicable to a very few cities, a greater liberality ought to be indulged toward purely public improvements is a legislative problem the determination of which either way can hardly justify the courts in seeking some other meaning from that shown on the face of the enactment. Such administrative interpretation as may be thought to appear from the facts stated is hardly so persuasive as the decision of the judges of the district court who tried the case below. Bonds issued in excess of the statutory limit, if they contain the usual recital to the contrary, are doubtless enforceable in the hands of innocent purchasers, and if the state, as the first purchaser from the city, holds bonds of that character the legislature has probably ample power to deal with the matter so as to prevent loss.

The language of the statute under discussion seems to us not so ambiguous as to warrant a strained effort to avoid its apparent meaning; nor do the reasons assigned for giving the language another construction appeal to us as sufficient for the purpose. Our conclusion on this point makes it unnecessary and inadvisable to determine the others that have been argued, particularly as some of them involve an inquiry as to the constitutionality of the statute upon which the paving project is based. "It is a well-settled principle that the constitutionality of a statute will not be determined in any case, unless such determination is absolutely necessary in order to determine the merits of the suit in which the constitutionality of such statute has been drawn in question." (12 C. J. 780.)

The judgment is affirmed.