No. 69,224

ANITA MARIE MCVAY a/k/a ANITA MARIE BOLEN, *Appellant*, v. JOSEPH E. RICH, M.D., *Defendant*, and MEMORIAL HOSPITAL CORPORATION OF TOPEKA, *Appellee*.

(874 P.2d 641)

Opinion filed May 27, 1994.

*Gary D. McCallister*, of Davis, Wright, Unrein, Hummer & McCallister, of Topeka, argued the cause, and *Brenda L. Head*, of the same firm, was with him on the briefs for appellants.

*Derenda J. Mitchell*, of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, argued the cause and was on the briefs for appellee.

*Marta Fisher Linenberger* and *Wayne T. Stratton*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, were on the brief for *amicus curiae* Kansas Hospital Association.

*Randall E. Fisher* and *Derek S. Casey*, of Michaud, Hutton, Fisher & Anderson, of Wichita, were on the brief for *amicus curiae* Kansas Trial Lawyers Association.

The opinion of the court was delivered by

DAVIS, J.: Anita Marie McVay filed a medical malpractice action against Dr. Joseph E. Rich and Memorial Hospital Corporation of Topeka for injuries she allegedly sustained in an operation performed by Dr. Rich at Memorial Hospital. McVay settled with Dr. Rich. The trial court granted Memorial Hospital summary judgment on McVay's claim that the hospital had negligently granted or continued staff privileges in Dr. Rich when it knew or should have known that he was incompetent. The Court of Appeals affirmed in 18 Kan. App. 2d 746, 859 P.2d 399 (1993), and we granted McVay's petition for review.

The sole question before this court is whether the following decision of the Court of Appeals is correct: "Under the provisions of K.S.A. 65-442(b) and K.S.A. 1992 Supp. 40-3403(h) [now K.S.A. 40-3403(h)], a licensed hospital cannot be held liable for damages because of the rendering of or failure to render professional services within the hospital by a physician who is licensed to practice medicine and surgery and covered under the Health Care Stabilization Fund, if the physician is not an employee or agent of the hospital." 18 Kan. App. 2d 746, Syl. ¶ 1.

The following facts as set forth in the Court of Appeals' opinion are undisputed:

"In April of 1990, McVay filed a lawsuit against Joseph E. Rich, M.D., and Memorial. Specifically, McVay alleged that on August 29, 1988, Dr. Rich negligently performed a hysterectomy and that as a result of his negligence, she was required to undergo additional surgeries.

"McVay also claimed that Memorial, the hospital where the hysterectomy was performed, was negligent in not properly providing or performing a quality assurance program or taking corrective action to suspend or revoke Dr. Rich's staff privileges when Memorial knew or should have known Dr. Rich's staff privileges had been withdrawn at other area hospitals. As a result of Memorial's alleged negligence, McVay claimed she required additional surgery and will incur additional medical expenses in the future. She also claimed she suffered and will continue to suffer pain, mental anguish, embarrassment, and humiliation as a result of her medical condition, which was caused by Memorial's negligent care and treatment.

"The record shows that Dr. Rich failed to renew his license to practice medicine and surgery within the time required by statute and therefore his license was cancelled as of August 1, 1987. The Kansas State Board of Healing Arts

(BOHA) also found probable cause to believe Dr. Rich made false statements on his request for reinstatement and practiced medicine from August 1, 1987, to October 30, 1987, without a valid license. The BOHA issued a final order in February of 1988 reinstating Rich's license to practice medicine as of February 6, 1988.

"Subsequently, in August of 1988, the BOHA filed another petition for revocation of Dr. Rich's license, finding probable cause that Rich had violated the Healing Arts Act, K.S.A. 65-2801 *et seq.* There is also evidence in the record to suggest that Dr. Rich's staff privileges had been revoked at St. Francis and Stormont-Vail hospitals in Topeka. Dr. Rich was licensed to practice medicine and surgery at the time he performed surgery on McVay." 18 Kan. App. 2d at 746-47.

## Court of Appeals' Decision

The Court of Appeals identified the issue in the following manner: "The sole issue in the case is whether the trial court erred in ruling that Memorial was immune from liability as a matter of law based on K.S.A 65-442(b)." 18 Kan. App. 2d 746. The district court had granted summary judgment on the basis of K.S.A. 65-442(b). The Court of Appeals' decision then turns on its interpretation of K.S.A. 65-442(b), which provides:

"There shall be no liability on the part of and no action for damages shall arise against any licensed medical care facility because of the rendering of or failure to render professional services within such medical care facility by a person licensed to practice medicine and surgery if such person is not an employee or agent of such medical care facility."

In affirming the trial court's conclusion that the above statute immunized the hospital from liability for plaintiff's claim, the Court of Appeals considered K.S.A. 65-442(b) in the context of the legislative scheme that the legislature recently enacted "to try to stem the perceived tide of ever-increasing medical malpractice insurance premiums." 18 Kan. App. 2d at 749.

The court also noted that K.S.A. 40-3401 *et seq.*, the Health Care Provider Insurance Availability Act (HCPIAA), provides immunity to health care providers qualified for coverage under the Health Care Stabilization Fund from "vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified

for coverage under the fund." K.S.A. 40-3403(h). The HCPIAA requires health care providers to maintain minimum professional liability insurance as a condition to providing services in Kansas. K.S.A. 40-3402. The "fund" is the Health Care Stabilization Fund, which is designed to cover amounts due in excess of the required professional liability insurance coverage. K.S.A. 40-3403(a), (c). A health care provider is "qualified for coverage under the fund" if he or she has the required professional liability coverage or qualifies as a self-insurer under the statute. K.S.A. 40-3403(g).

The Court of Appeals concluded that "[t]he language of these statutes shows the legislature's unmistakable intent to limit the liability of health care providers and medical care facilities." 18 Kan. App. 2d at 751. "The plain language of K.S.A. 65-442(b) indicates that the legislature meant to immunize licensed medical care facilities from liability arising out of the rendering of or failure to render professional services by persons licensed to practice medicine but not employed by the medical facility." 18 Kan. App. at 751. "K.S.A. 1992 Supp. 40-3403(h) . . . eliminates not only vicarious liability but also *responsibility* for any injury arising out of the rendering of or failure to render professional services by another health care provider who is also covered by the fund." 18 Kan. App. 2d at 752.

### Corporate Negligence Theory

McVay argues now and argued before the Court of Appeals that the plain language of K.S.A. 65-442(b) states that hospitals would not be liable for damages "because of" a licensed doctor's rendering or failure to render professional services. Her action against the hospital does not seek to hold the hospital liable for damages because of Dr. Rich's negligence but because of the hospital's own negligence in allowing Dr. Rich to practice medicine in its hospital. Thus, she argues that K.S.A. 65-442(b) does not prevent this court from recognizing the hospital's liability for negligently retaining an independent contractor.

The recognition of an employer's liability for negligently retaining or employing an independent contractor is commonly referred to as the theory of "corporate negligence." Because cor-

porate negligence imposes liability on the hospital for its own negligence rather than making the hospital liable for another's negligence, McVay contends that K.S.A. 65-442(b) does not bar her claim.

The theory of corporate negligence has been discussed at length by courts and commentators. See, *e.g.*, *Darling v. Charleston Hospital*, 33 Ill. 2d 326, 211 N.E.2d 253 (1965), *cert. denied* 383 U.S. 946 (1966); Comment, *Corporate Negligence: Defining the Duty Owed by Hospitals to their Patients*, 30 Duq. L. Rev. 639 (1992); Comment, *Hospital Liability: The Emerging Trend of Corporate Negligence*, 28 Idaho L. Rev. 441 (1992). With respect to hospitals, "[c]orporate negligence . . . stands for the proposition that hospitals have an independent duty to ensure the health and safety of their patients." 28 Idaho L. Rev. at 442. The independent duties a hospital may owe to a patient may include, for example, the duty to exercise reasonable care in the procurement and maintenance of equipment; the duty to exercise reasonable care in granting, renewing, and extending staff privileges; the duty to monitor and review patients' treatment and progress; and the duty to make and enforce rules. 30 Duq. L. Rev. at 648-56.

Although the parties talk about "corporate negligence" as though it were a new legal doctrine, courts and commentators long have distinguished between an employer's vicarious liability for its employees' or independent contractors' torts and an employer's liability for its own negligence in connection with the work to be done. See Prosser and Keeton, The Law of Torts § 71 at 510 (5th ed. 1984).

"Where there is a foreseeable risk of harm to others unless precautions are taken, it is his duty to exercise reasonable care to select a competent, experienced, and careful contractor with the proper equipment, and to provide, in the contract or otherwise, for such precautions as reasonably appear to be called for. So far as he in fact gives directions for the work, furnishes equipment for it, or retains control over any part of it, he is required to exercise reasonable care for the protection of others; and he must likewise interfere to put a stop to any unnecessarily dangerous practices of which he becomes informed, and make a reasonable inspection of the work after it is completed, to be sure that it is safe. . . . In all of these cases, he is liable for his personal negligence, rather than that of the contractor." Prosser and Keeton at 510-11.

The Restatement (Second) of Torts also recognizes an employer's liability for negligent selection of an independent contractor:

"An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor .
(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or
(b) to perform any duty which the employer owes to third persons." Restatement (Second) of Torts § 411 (1963).

Comment (b) to section 411 clarifies that such liability is different from vicarious liability:

"The employer of a negligently selected contractor is subject to liability under the rule stated in this Section for physical harm caused by his failure to exercise reasonable care to select a competent and careful contractor, but only for such physical harm as is so caused. In order that the employer may be subject to liability it is, therefore, necessary that harm shall result from some quality in the contractor which made it negligent for the employer to entrust the work to him."

While Kansas has recognized an employer's liability for negligent retention of an *employee,* see, *e.g., Thies v. Cooper,* 243 Kan. 149, Syl. ¶ 1, 753 P.2d 1280 (1988); *Plains Resources, Inc. v. Gable,* 235 Kan. 580, 590-91, 682 P.2d 653 (1984), McVay concedes that there are no cases in which this court has recognized an employer's liability for negligently retaining an independent contractor. Nor have we found any Kansas cases that expressly have rejected imposing liability on employers for negligent hiring and retention of independent contractors.

McVay contends that her claim against the *hospital* is not because of Rich's negligence but because of the hospital's negligence in allowing Rich to perform surgery in its hospital. Although she would have no claim against the hospital if she had not been injured by Rich, she claims that the hospital owed her an independent duty to exercise reasonable care in extending staff privileges. She claims essentially that medical care, especially surgery, is "work which will involve a risk of physical harm unless it is skillfully and carefully done." Accordingly, she contends that the hospital had a duty to "exercise reasonable care to employ a com-

petent and careful contractor." Restatement (Second) of Torts §
411.

The commentators note one policy reason for imposing such
a duty on a hospital is to encourage hospitals to exercise reason-
able care in selecting physicians:

"The most powerful reason for holding a hospital liable for the damages
caused by an independent physician is that the hospital has the capability to
determine who will be granted use of its facilities. Once these privileges have
been granted, the hospital is in the best position to monitor the use of its facilities
by competent physicians, and hospitals generally are in a better financial position
to absorb these burdens than are patients." 28 Idaho L. Rev. at 454.

A central theme running throughout the cases adopting the
corporate negligence theory is perhaps best expressed in the fol-
lowing quote from the Duquesne Law Review article on hospital
liability for corporate negligence: "[A]s a matter of public policy,
'hospitals are in the best position to protect their patients and,
consequently have an independent duty to select and retain only
competent independent physicians seeking staff privileges.' " 30
Duq. L. Rev. at 650-51 (quoting *Insinga v. LaBella*, 14 Fla. 214,
543 So. 2d 209 [1989]).

. McVay cites cases from numerous jurisdictions in her brief that
have adopted the corporate negligence theory in imposing liability
on hospitals for their negligence in retaining independent con-
tractor physicians. See, for example, *Darling v. Charleston Hos-
pital*, 33 Ill. 2d 326. None of the cases cited address statutes that
are even remotely similar to K.S.A. 65-442(b) or 40-3403(h).

Whatever reasons may exist for the adoption in Kansas of the
corporate negligence theory in regard to hospital liability, we sim-
ply do not reach this question. The clear, unambiguous language
of K.S.A. 65-442(b) and K.S.A. 40-3403(h) requires the conclusion
that those statutes bar McVay's claim against the hospital. McVay's
claim is barred by 65-442(b) because her claim is "because of"
Dr. Rich's rendering or failure to render professional services.
McVay would have no claim against the hospital if Rich had not
negligently treated her. Her claim against the hospital is derivative
of and dependent upon her claim against Dr. Rich.

Similarly, McVay's claim against Memorial "arise[s] out of [Dr.
Rich's] rendering of or the failure to render professional services,"
so it is barred by K.S.A. 40-3403(h). K.S.A. 40-3403(h) provides:

"A health care provider who is qualified for coverage under the fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund. The provisions of this subsection shall apply to all claims filed on or after the effective date of this act."

Under K.S.A. 40-3403, a health care provider who is qualified for fund coverage will not be vicariously liable or responsible for claims "arising out of" the professional negligence of another health care provider who is qualified for fund coverage. The undisputed facts establish that at the time of the operation both Dr. Rich and the hospital were health care providers, both were covered under the fund, Dr. Rich was not an agent or employee of the hospital, and McVay's injury arose out of the rendering of professional services by Dr. Rich. Given these undisputed facts, the Court of Appeals was correct in its conclusion that

"K.S.A. 65-442(b) eliminates all liability and provides that no action for damages may be brought against a licensed medical care facility if that action arises out of the rendering of or failure to render professional services by a licensee who is not an employee or agent of the facility. In other words, a hospital cannot be held liable for the malpractice of a physician who is an independent contractor, pursuant to K.S.A. 65-442(b), nor can the hospital be vicariously liable or otherwise responsible for the malpractice of a licensee pursuant to K.S.A. 1992 Supp. 40-3403(h)." 18 Kan. App. at 753.

## Constitutionality

The plaintiff did not raise before the trial court, nor before the Court of Appeals, a constitutional challenge to K.S.A. 65-442(b) or K.S.A. 40-3403(h). In the plaintiff's brief before this court, counsel contends that the statutes as applied by the trial court and the Court of Appeals are unconstitutional because they violate §§ 1 and 18 of the Kansas Constitution Bill of Rights. According to the plaintiff, the Court of Appeals' approach in deciding the case raised constitutional questions of first impression, and it therefore is appropriate for the plaintiff to challenge the statutes' constitutionality before this court. Apparently, this claim is based upon the plaintiff's contention that the Court of Appeals utilized the case of *Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991), which upheld the constitutionality of K.S.A. 40-3403(h).

We agree with the Court of Appeals' statement that the sole issue was whether the trial court erred in ruling that Memorial was immune from liability as a matter of law based on K.S.A. 65-442(b). While the *Bair* decision was discussed, the resolution of this case by the Court of Appeals did not involve the constitutionality of the statutes but rather an interpretation of K.S.A. 65-442(b).

Early cases before this court expressed the wisdom that this court should not consider the constitutionality of a statute if the same question has not been raised below. In *Keplinger v. Kansas City*, 122 Kan. 158, 164, 251 Pac. 413 (1926), we approved the following language from 12 C.J. 780: " 'It is a well-settled principle that the constitutionality of a statute will not be determined in any case, unless such determination is absolutely necessary in order to determine the merits of the suit in which the constitutionality of such statute has been drawn in question.' "

We held in *Board of County Commissioners v. Brown*, 183 Kan. 19, Syl. ¶ 2, 325 P.2d 382 (1958):

"Acts of the legislature are presumed to be constitutional and valid and no challenge thereof should be entertained on appeal to the Supreme Court unless the particular constitutional provision alleged to be violated, or the particular controlling record to prove the invalidity, has been alleged in the pleadings and presented to the lower court." See *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 552 P.2d 885 (1976).

In *Brown*, we also explained an important rationale for this general rule:

"This rule is based upon considerations of practical necessity in the orderly administration of the law and of fairness to the court and the opposing party, and upon principles underlying the doctrines of waiver and estoppel. Obviously, the ends of justice are served by avoidance of the delay and expense incident to appeals, reversals, and new trials upon grounds of objection which might have been obviated or corrected in the trial court if the question had been raised. There would be no assurance of any end to litigation if the new objections could be raised on appeals. (3 Am. Jur., Appeal and Error, § 246, p. 25.)" 183 Kan. at 22.

Only in cases where it is virtually impossible to decide the issue on the merits without considering the constitutionality will this court entertain the question of constitutionality. For example, in

the case of *Van Sickle v. Shanahan*, 212 Kan. 426, Syl. ¶ 3, 511 P.2d 223 (1973), we noted:

"The constitutionality of a statute or an amendment to the Constitution should be considered in an action where it is necessary in order to determine the merits of the action or where the issues cannot be intelligently decided without doing so, notwithstanding the failure of the parties to raise the constitutional question, failure to plead the question, or failure to present the question to the district court."

We should address constitutional questions raised for the first time in this court only when "[w]e cannot intelligently dispose of this litigation without considering and discussing" those constitutional questions. *State v. Nelson*, 210 Kan. 439, 443, 502 P.2d 841 (1972).

In this case, we are not faced with a "compelling state interest," *Vaughn v. Murray*, 214 Kan. 456, Syl. ¶ 4, 521 P.2d 262 (1974), nor has plaintiff advanced any justification for this court to depart from its " 'well-settled principle that the constitutionality of a statute will not be determined in any case, unless such determination is absolutely necessary in order to determine the merits of the suit in which the constitutionality of such statute has been drawn in question.' " *Keplinger*, 122 Kan. at 164.

As indicated above, our rule is grounded in wisdom based upon experience as well as upon fairness—wisdom, because a constitutional challenge, while seemingly a strictly legal question, often involves facts which may not be injected into the record upon such a late challenge; wisdom, because this court profits greatly from having the matter tried by the parties before the trial court and refined again before the Court of Appeals, if that is the path it takes; fairness, because consideration of the issue for the first time on appeal smacks of trial by ambush. Even if the constitutional question is genuinely raised, the opposing party is prevented from responding by marshalling evidence before a court to counter the alleged infirmity. It has been said that the wheels of justice grind exceedingly slowly but exceedingly fine. It is precisely this grist for the mill that gives birth to sound constitutional decisions.

We, therefore, decline to consider for the first time on appeal the constitutional challenge, based on our general rule and because no compelling State interest has been demonstrated.

The judgments of the Court of Appeals and the district court are affirmed.