(636 P.2d 215)

No. 52,368

MAX I. MELLIES, Guardian ad litem and Conservator of the Estate of Berneice Mellies, *Appellant,* v. NATIONAL HERITAGE, INC., *Appellee.*

Opinion filed November 25, 1981.

*James S. Phillips, Jr.,* of Phillips & Phillips Law Offices, Chartered, of Wichita, for appellant.

*Christopher Randall,* of Turner & Boisseau, Chartered, of Wichita, for appellee.

Before JUSTICE HOLMES, presiding; MEYER, J.; and HARRY G. MILLER, District Judge Retired, assigned.

MEYER, J.: This case involves a question of nursing home malpractice.

Berneice Mellies was hospitalized in the Wichita Osteopathic Hospital on December 13, 1977, for a broken hip. She was transferred to the Northeast Nursing Center (nursing center), owned and operated by National Heritage, Inc. (appellee), on December 27, 1977, where she remained until February 1, 1978.

On February 1, 1978, Berneice Mellies was taken for an x-ray, at which time a large decubitus ulcer (bedsore) was discovered on her right hip. She was hospitalized for approximately 40 days at Osteopathic Hospital for treatment of this and other decubitus ulcers.

Berneice Mellies commenced this action alleging negligent care had caused and prolonged her decubitus ulcers and general debilitation. Before trial, Berneice was declared an incapacitated person and her son, Max Mellies (appellant), was appointed her guardian and conservator and substituted as party plaintiff. At trial, before a jury, various nurses testified as to Berneice Mellies' condition while at the Osteopathic Hospital (the time she was there prior to admission to the nursing center), and stated they did not notice or treat for decubitus ulcers there. An admission chart of the nursing center notes the presence of a dollar-size decubitus on the left heel, a dime-size redness on the right heel, a small decubitus on the right buttocks and a note regarding the left hip stating, "feel this is a decubit forming as the skin is very dis-colored." A surgical scar and bruises were also noted on the left hip.

Appellant testified as to the care he observed at the nursing center and the nursing center records were also introduced. Appellant attempted to have Mr. Michael Goodwin, a registered nurse and instructor of nursing at Wichita State University, qualified as an expert as to the care of patients and as to the cause, prevention and treatment of decubitus ulcers. He was allowed to testify as to the standard of care for nursing practice in treating such ulcers, but was not allowed to testify as to their cause or cure.

At the conclusion of appellant's evidence, appellee moved for a directed verdict for the defense. The court sustained the motion on the basis that no medical expert testimony or evidence had been offered. Appellant brings this appeal from the directed verdict in favor of the appellee.

The trial court stated in its journal entry:

"THEREUPON, the Court having heard the arguments of counsel and being fully advised in the premises, sustains the defendant's motion for a directed verdict on the grounds that the plaintiff failed to present expert testimony of a medical doctor and accordingly that the plaintiff's evidence was insufficient as a matter of law or did not establish a prima facie case."

A plaintiff must establish three elements for a case of actionable negligence:

" '(1) [T]here must exist a duty on the part of the defendant to protect the plaintiff from the injury of which he complains; (2) the defendant must fail to perform that duty; and (3) an injury to the plaintiff must proximately result from such failure. If no reasonable man could find that under the circumstances all three elements are present, then a directed verdict or judgment n.o.v. is proper. . . .' " *George v. Breising,* 206 Kan. 221, 226, 477 P.2d 983 (1970), citing from *Shafer v. Monte Mansfield Motors,* 91 Ariz. 331, 333-4, 372 P.2d 333 (1962).

An appellate court's standard of review on a directed verdict is as follows:

"In ruling on a motion for directed verdict pursuant to K.S.A. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. The same basic rule governs appellate review of a motion for a directed verdict. (Following *Simpson v. Davis,* 219 Kan. 584, Syl. ¶ 3, 549 P.2d 950 [1976].)" *Care Display, Inc. v. Didde-Glaser, Inc.,* 225 Kan. 232, Syl. ¶ 5, 589 P.2d 599 (1979).

The first issue presented is whether the testimony of a nurse and admission of treatises is sufficient to establish the standard of care of nursing homes in the absence of expert medical testimony.

In the trial transcript, the trial court noted specifically two areas where it felt expert medical testimony was essential to establish a case: the standard for treatment of decubitus ulcers, and proximate cause of Berneice Mellies' ulcers.

The trial court stated:

"I don't think a nurse, whether he's a college professor or what, can testify as to the cause and cure of physical ailments like an ulcer. I think that takes a doctor. He may testify as to what good care would consist of. But there is one other step

on attacking negligence and damages to a case and that is the cause of the thing and whether or not it was treated properly for a cure."

This case deals with the duty of the nursing staff at the nursing center to provide a certain level of care and treatment to prevent decubitus ulcers. The general duty of a private hospital was stated in *McKnight v. St. Francis Hosp. & School of Nursing,* 224 Kan. 632, 633, 585 P.2d 984 (1978):

"A private hospital is bound to exercise toward a patient such reasonable care as the patient's known condition may require, the degree of care being in proportion to the patient's known physical and mental ailments. The extent and character of the care that a hospital owes its patients depends upon the circumstances of the particular case, and the measure of duty of a hospital is to exercise that degree of care, skill and diligence used by hospitals generally in the community.

A similar community standard applies to nursing homes. The requirement of expert medical testimony to establish negligence has been recognized in actions against hospitals or nursing staff as well as actions against physicians.

"Expert medical testimony is ordinarily required to establish negligence on the part of either a physician or a hospital in their care and treatment of a patient, unless the medical procedures employed are so patently bad that negligence or lack of skill is manifest to a lay observer or other acts complained of could be regarded as negligent by applying the common knowledge and experience of mankind. (*Karrigan v. Nazareth Convent & Academy, Inc.,* [212 Kan. 44, 510 P.2d 190 (1973)])." *Hiatt v. Groce,* 215 Kan. 14, 19, 523 P.2d 320 (1974).

In *Karrigan* and *Hiatt,* the court applied the common knowledge exception to the requirement of expert medical testimony in finding a hospital liable for its nurses' failure to notify a doctor of a patient's deteriorating condition.

There were two areas of negligence alleged in the case at bar: first, negligent care in failing to prevent the formation of decubitus ulcers, and second, negligent treatment after the ulcer had formed.

Instructor-nurse Michael Goodwin was allowed by the trial court to set out the standard of care with regard to prevention of decubitus ulcers. He testified that the standard methods for preventing the development of bedsores (in Sedgwick County) include "alleviation of pressure through frequent repositionings of the patient, frequent changes of position, keeping the skin clean and dry of any perspiration or incontinence stool or urine, observations of the skin at frequent intervals for the possibility of

beginning tissue breakdown, and then extra effort placed on keeping those areas free of pressure."

Mr. Goodwin also testified that the standard for changing the position of bedridden patients is at least once every two hours.

He further stated that it would be standard nursing care to provide some means of reconditioning an individual's bladder to respond to the need to urinate once he or she has lost that sensation from having an indwelling catheter in for a number of days.

Mr. Goodwin's testimony was supplemented by the admission of K.A.R. 28-39-6(E) into evidence. This regulation states:

"(E) *Personal hygiene.* (1) A complete bath at least every other day and more often as indicated for residents confined to bed shall be given. Incontinent residents shall be checked at least every two hours and shall have partial baths and clean linens promptly each time the bed or clothing is soiled. Pads or diapers shall be used to keep the bed dry and for the resident's comfort. Special attention shall be given to the skin to prevent irritation. Rubber, plastic, or other types of protectors shall be kept clean, completely covered, and not in direct contact with the resident. Soiled linen and clothing shall be removed immediately from the resident areas to prevent odors.

"(2) There shall be an ongoing program for care of the skin. Bony prominences and weight-bearing parts, such as heels, elbows, and back, shall be bathed and given care frequently to prevent discomfort and the development of pressure sores. If pressure sores exist, treatment shall be given on a written medical order. The position of bed residents shall be changed at least every two hours during the day and night. Residents shall be positioned in good body alignment. Precautions shall be taken to prevent foot drop in bed residents.

"(3) There shall be availability of fresh, cold water and other fluids at the bedside for all residents unless fluids are restricted.

"(4) The resident shall be assisted with oral hygiene to keep mouth, teeth, or dentures clean. Measures should be used to prevent dry, cracked lips."

As to the area of *treatment* of pressure sores, the court did not allow Mr. Goodwin to testify as to medical treatment where it requires a physician's attention, but he was allowed to testify as to general nursing practices. He stated:

"One of the major focuses of treatment is keeping the area clean and allowing—or arresting the continuation of the ulcer which is alleviated by keeping the individual off of that particular area where the ulcer has started forming, keeping it dry through the use of a heat lamp for a period of time, keeping it clean, the application of Maalox or other drying substances."

In addition, there was testimony from Miss Doss, who was a licensed practical nurse at Osteopathic Hospital, who does treatments on patients and changes dressings. She stated that doctors would order a heat light on the bedsores or Maalox with oxygen,

and the nurses would give the treatments. She also stated dressings would be put on draining decubitus ulcers.

We conclude that as to the areas concerning which the nurses were allowed to testify, they were qualified to state the standard of care. Since this case deals with *nursing* negligence, it would seem that the jury had competent evidence from which it could determine the standard of nursing care for patients for the prevention and treatment of decubitus ulcers.

The next issue is whether the testimony of appellant and the admission of nursing records was sufficient evidence that the care given fell below the standard of care in the absence of expert medical testimony.

Appellant visited his mother daily for a couple of hours a day, and sometimes stayed with her for three hours. He stated that his mother was sometimes in bed and sometimes sitting in a wheelchair. He testified to what he had observed at the nursing center. He stated that a month after his mother was there, he noticed wetness or incontinence. He noticed her legs and wheelchair pad were wet and that odors emanated from those areas. He had also noticed signs of incontinence in her bed and had noticed urine and some bowel excreta smeared in the bed. When he noticed these things, he went to someone to have them take care of her, which they did. He further stated that he first noticed the bedsore on her right hip when she was taken for a hip x-ray on February 1, 1978. He observed a large pussy-looking sore surrounded by redness, about the size of a 50-cent piece. At that time, Berneice was admitted to the Osteopathic Hospital for treatment of this and other sores.

Berneice's nurses' notes from the nursing center were also admitted into evidence.

Appellant claims that the nurses' notes are admissions as to the care Berneice received.

K.S.A. 60-460(n) provides for admission of records to show an "absence of entry in business records." Evidence of the absence of a memorandum or record of a business of an asserted act, event or condition is admissible to prove the nonoccurrence of the act or event if the judge finds that it was the regular course of that business to make such memoranda at the time thereof or within a reasonable time thereafter, and to preserve them.

Robin Casewell, a nurse at the nursing center, stated that she

would note a decubitus ulcer on the chart unless already mentioned. She also stated that nurses were required to make notations of a patient's condition and change of condition as to anything that was out of the routine. Mary Doss at the Osteopathic Hospital stated that treatments would be charted. Bernice Tobar, a nurse at the Osteopathic Hospital, stated that a patient was turned every couple of hours at the Osteopathic Hospital, but that was routine and wasn't charted. K.A.R. 28-39-14 requires that at nursing homes, each drug or treatment administered to residents shall be recorded daily on the nursing records.

The issue then is whether the absence of a record of treatment on several days indicated that there was no treatment given on that date. The above testimony constitutes some evidence that such entries regarding treatment would be made in the regular course of business. This would permit the jury to find that *no* treatment was given nine days during Berneice's stay. It would not take a medical specialist to so testify, and the jury could infer this was negligence.

Nurse Michael Goodwin also testified that the standard of treatment for decubitus ulcers as listed in plaintiff's exhibit 12 was below the standard for nursing care because the dressing should be changed more often than every 24 hours.

The only evidence regarding the failure to turn the patient every two hours was the checklist chart. It indicates several shifts where there is no checkmark for turning the patient. However, there is no testimony in the record which positively indicates that these checkmarks are entered in the regular course of business. Such additional testimony would be needed in order for the checklist chart to be competent evidence.

It would seem that the kinds of determinations involved in this issue, *i.e.*, whether the patient was kept dry and clean, whether she was treated regularly, etc., were within the common knowledge of the jury. It would be for the jury to weigh the evidence and determine whether there was negligence on the part of the nursing home staff.

We must next consider whether the treatises, testimony of a nurse and lay observations were sufficient evidence to support an inference of proximate cause in the absence of expert medical testimony.

The trial court was specifically concerned with this element.

The court ruled that a nurse cannot testify as to the cause and cure of physical ailments like an ulcer.

As a general rule in medical malpractice cases, expert testimony is necessary to support the conclusion as to causation. See *Cervantes v. Forbis,* 73 N. M. 445, 389 P.2d 210 (1964); *Barnes v. Bovenmyer,* 255 Iowa 220, 122 N.W.2d 312 (1963). These cases also recognize that if causation is within the common knowledge of the jury, medical testimony is not necessary. See *Jarboe v. Harting,* 397 S.W.2d 775 (Ky. 1965). See also 13 A.L.R.2d 11, § 5, p. 31; and 61 Am. Jur. 2d, Physicians, Surgeons and Other Healers § 348, p. 510.

In *James v. Grigsby,* 114 Kan. 627, 632, 220 Pac. 267 (1923), it was stated:

"And where negligence in the treatment is shown by medical witnesses and the evidence shows a bad result, it is the province of the jury to say whether the result was caused by the negligence."

Appellant was allowed to introduce treatise testimony from Merk's Manual (13th ed.) (according to testimony, a common textbook used by health care personnel) as to the causes of decubitus ulcers in general. This testimony was read into the record by Mr. Goodwin:

" 'Both intrinsic and extrinsic factors precipitate decubitus ulcers. Intrinsic factors include loss of pain and pressure sensations that ordinarily prompt the patient to shift position and relieve the pressure, and the thinness of fat and muscle padding between bony weight-bearing prominences and the skin. Disuse atrophy, malnutrition, anemia, and infection play contributory roles. In a paralyzed extremity, loss of vasomotor control leads to a lowering of tone in the vascular bed and a lowered circulatory rate. Spasticity, especially in patients with spinal cord injuries, can place a shearing force on the blood vessels to further compromise circulation.

" 'The most important of the extrinsic factors is pressure. Its force and duration directly determine the extent of the ulcer. Pressure severe enough to impair local circulation can occur within hours in an immobilized patient, causing local tissue anoxia that progresses, if unrelieved, to necrosis of the skin and subcutaneous tissues. The pressure is due to infrequent shifting of the patient's position; friction and irritation from ill-adjusted supports or wrinkled bedding or clothing may be contributory. Moisture, which leads to tissue maceration, predisposes to decubitus. It may result from perspiration or from urinary or fecal incontenence.' "

Also, the following testimony was read by Mr. Goodwin from the textbook of V. Henderson & G. Knight, *The Principles and Practice of Nursing,* p. 752 (6th ed.):

" 'Preventive Measures and the Responsibility of the Nurse. Prevention of bedsores is the responsibility of nurses. As students they should learn how to take care of a patient in such a way as to prevent bedsores, for with sufficient nursing care they can be prevented. The carelessness, neglect, and ignorance of one nurse may in a few hours undo the most skilled and painstaking care of another. "An ounce of prevention is worth a pound of cure." Development of a pressure sore is a reflection on the nursing care the patient has received. Hospital nursing staffs make such an effort to prevent their occurrence that student nurses may have little if any opportunity in some situations to see the treatment of a well-developed lesion unless patients come to the hospital with this condition from homes where skilled care was not available.' "

It is noted that proximate cause does not change with locality. *Montgomery v. Stary*, 84 So. 2d 34 (Fla. 1955). The treatise testimony would be competent.

Nurse Doss, an LPN at Osteopathic Hospital, was asked whether the treatments there were usually effective, to which she responded, "Yes."

Nurse Michael Goodwin stated:

"If the treatment that I have described in my previous testimony were applied in a consistent manner and much nursing attention were directed towards the arresting or treating of the decubitus ulcer, yes indeed, they would improve."

The big issue of causation in this case is whether the decubitus ulcers were contracted or made worse by the nursing center, or by the Osteopathic Hospital from which Berneice was transferred. Given the testimony and the evidence about when each decubitus ulcer appeared on the nursing records, we conclude this question could be resolved by a jury without the testimony of a medical expert.

Since this case involves primarily a nursing problem, we feel that nurses are experts under the facts of this case and that there was sufficient evidence as to all three negligence elements, even without a doctor's testimony, to establish a jury question as to whether there was negligence in this case.

It is also contended that the doctrine of res ipsa loquitur is applicable in this case.

The doctrine of res ipsa loquitur was recently discussed in *Arterburn v. St. Joseph Hospital & Rehabilitation Center*, 220 Kan. 57, 64-65, 551 P.2d 886 (1976). It was therein stated:

"Essential to the application of the doctrine in any given case are three conditions. First, it must be shown that the thing or instrumentality causing the injury or damage must be within the exclusive control of the defendant. Second, the occurrence must be of such kind or nature as ordinarily does not occur in the

absence of someone's negligence. Third, the occurrence must not have been due to the contributory negligence of the plaintiff *(Bias v. Montgomery Elevator Co.,* 216 Kan. 341, 343, 532 P.2d 1053).

"To meet the first condition of *res ipsa loquitur* the plaintiff must show two things: (1) The specific thing or instrumentality which actually caused his injury or damage, and (2) that the thing or instrumentality which caused his injury or damage was within the exclusive control of the defendant. Therefore, the doctrine is inapplicable where the thing or instrumentality which caused the injury or damage is unknown or cannot be shown. *(Chandler v. Anchor Serum Co.,* 198 Kan. 571, 426 P.2d 82.)

"In *Travelers Ins. Co. v. Hulme,* 168 Kan. 483, 213 P.2d 645, this court commented:

" '. . . The doctrine has no application to proximate cause—or perhaps we should say no application to the initial fact, or the fundamental or foundation fact which caused the injury or damage. The doctrine will permit an inference or presumption that the known act—or foundation fact—which produced the injury (proximate cause) was a negligent act, but it will not permit such an inference or presumption as to just what foundation fact did produce the injury—or, in other words, as to what act was the initial cause of the damage. Thus the doctrine cannot be applied where the thing which actually caused the injury or damage is unknown; but when it is known and disclosed and relied upon as the basis of the damage or injury, the application of the doctrine of *res ipsa loquitur* will infer negligence in the doing of the *thing* or in the commission of the *act.* . . .' (p. 486.)"

One of the principal issues in this case was whether the decubitus ulcers were the result of care received at the Osteopathic Hospital or from care received from the nursing center. Given the fact that proximate cause was not certain, the doctrine of res ipsa loquitur would not be applicable.

It should also be noted that the issue of res ipsa loquitur was raised for the first time on appeal. Because res ipsa loquitur was not presented below, it cannot be raised now:

"A litigant may not for the first time on appeal change the theory of his case from that on which it was presented to the trial court, nor may he present matters or issues which he did not bring to the attention of that court." *Goff v. American Savings Association,* 1 Kan. App. 2d 75, Syl. ¶ 1, 561 P.2d 897 (1977).

Appellant claims that Mr. Goodwin was qualified as an expert in the nursing field to give certain opinions. The trial court had ruled these opinions required the expertise of a doctor and were therefore inadmissible.

Expert testimony admissibility is controlled by K.S.A. 60-456. Under K.S.A. 60-456(*b*)(2), expert testimony must be "within the scope of the special knowledge, skill, experience or training possessed by the witness."

It is noted initially that no proffer was made as to what the opinion of Nurse Goodwin would be as required by K.S.A. 60-405:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers."

However, here, since we reverse for other reasons, we offer the following guidelines with regard to the opinions properly within a nurse's expertise. While rulings regarding the qualifications of witnesses to testify are in the discretion of the trial court, we conclude a nurse who had had wide experience with bedsores is, in fact, an expert as to decubitus ulcers since their prevention, treatment and cure are largely nursing duties. Thus, if a proper foundation is laid as to the nurse's experience with decubitus ulcers, she or he can qualify as an expert as to causation and as to such parts of treatment and cure that are performed by such nurse.

We conclude there was sufficient evidence to go to the jury as to whether there was nursing home malpractice, even without a physician's testimony. The doctrine of res ipsa loquitur is not applicable, but even if it were, it was not raised below.

Reversed and remanded for new trial in accord with this opinion.