No. 78,892

NEIL ALDOROTY, M.D., *Appellee,* v. HCA HEALTH SERVICES OF KANSAS, INC., a Kansas Corporation, d/b/a WESLEY MEDICAL CENTER, *Appellant.*

(962 P.2d 501)

Opinion filed July 10, 1998.

*James R. Hanson,* of Boyer, Donaldson & Stewart, LLP, of Wichita, argued the cause, and *Rachelle Worrall Smith, John H. Gibson,* and *Michael L. North,* of the same firm, were on the briefs for appellant.

*Mark B. Hutton,* of Hutton & Hutton, of Wichita, argued the cause, and *Anne H. Pankratz* and *Derek S. Casey,* of the same firm, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a medical malpractice case. Neil Aldoroty, M.D., sued three radiologists and HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center (Wesley), alleging that their negligence caused delay in the diagnosis of his lymphoma, which deprived him of a chance for a better recovery or cure. The radiologists settled before trial. A jury found Wesley 100% at fault and awarded $1,245,000 to Aldoroty. Wesley appeals from the trial court's denial of its motion for directed verdict, from the jury verdict, and from the trial court's denial of its motion for new trial.

Defendant Wesley is a for-profit Kansas corporation. Plaintiff Aldoroty is a psychiatrist and a member of the medical staff at Wesley. Before trial began, Aldoroty entered into a settlement

agreement with radiologists David Breckbill, M.D., John Lohnes, Jr., M.D., and Charles McGuire, M.D., who had been codefendants with Wesley in this suit. The doctors' names were deleted from the caption of the lawsuit, but their names appeared on the verdict form for the purpose of comparative fault. Dan Francisco, M.D., Aldoroty's personal physician, also was identified in the instructions and on the verdict form as a person to whom fault could be attributed.

Aldoroty's theory of liability was that the radiologists failed to detect changes in his chest X-rays and that their failure was at least partially attributable to the hospital's failure to furnish them with previous films for comparison. The X-rays were taken when Wesley staged its annual Medical Staff Recognition Week (also called Physicians Appreciation Week). As a member of the medical staff at Wesley, Aldoroty was eligible to and did participate in the health audits provided during Medical Staff Recognition Week. Aldoroty testified that he had a chest X-ray taken as part of his health audit every year, beginning in 1981. When Aldoroty had a chest X-ray as part of his 1993 health audit, an abnormality was found. The radiology report states that the X-ray was interpreted by "Braun, William T. III and Shurtz, Glen L." on September 30, 1993. The report states:

"OPINION: There is an abnormal soft tissue fullness suggesting a mass overlying the aortic knob in the AP window region. I do not see a definite mass on the lateral view. This is stable over the past year, but is a change from earlier years. I would suggest a CT scan of the chest for further evaluation to check for mediastinal mass/adenopathy.

"PA and lateral views show the heart size normal. The lungs are clear, PA view shows slight fullness in the mediastinum overlying the aortic knob. The aortic window appears obscured. This is suggestive of mass here. On the lateral view, however, I do not see any abnormality. There is no other abnormality noted.

"Comparison is made to the previous exam done here one year ago. In retrospect a similar finding was noted at that time although not reported. It has certainly not changed any in the past year. The findings do represent a change, however, from earlier studies from 1991 and 1990."

The stamped signature, Glen L. Shurtz, M.D., appears at the bottom of both pages of the report.

The 1991 X-ray was interpreted by Drs. Lohnes and McGuire. The report states: "There is no cardiovascular, pulmonary, mediastinal, or pleural disease. IMPRESSION: Negative chest." The 1992 X-ray was interpreted by Dr. Breckbill. The report states exactly what the 1991 report stated.

Aldoroty received a copy of the 1993 radiology report in the mail on October 8, 1993. He called his physician, Dr. Dan Francisco, to arrange a CT scan. He had two scans, one at Wesley and one at St. Francis. He had bone marrow tested and an enlarged lymph node under his arm biopsied. On the basis of the pattern discernible in the test results, Aldoroty was diagnosed with non-Hodgkin's lymphoma, Stage IV.

Non-Hodgkin's lymphoma is cancer that begins as a tumor in the lymph system and then may spread to other places. Hodgkin's and non-Hodgkin's are two broad groups of lymphoma that are distinguished by cell type. Within the non-Hodgkin's category, there are three subcategories of cell-types. Aldoroty's disease is classified as "low grade." For the low-grade cell type of non-Hodgkin's lymphoma, the disease advances from Stage I to II to III and then to IV. The following stage descriptions were given by Jay Zatzkin, M.D., the oncologist who diagnosed Aldoroty's cancer:

"Stage I, patients with disease in one area, and thus on one side of the diaphragm—diaphragm dividing our chest from our belly.

"Stage II, disease in two areas, but both are on the same side of the diaphragm; chest, under the arm, for example.

"Stage III, lump in the chest—lump in the chest, but also a lump in the lymph glands that are on the back of the belly . . . .

. . . .

"Stage IV disease[,] where Dr. Aldoroty's disease was found[,] is felt with conventional treatment to not be curable, meaning patients such as Dr. Aldoroty may achieve a remission. . . . But I cannot tell him based on the medical literature that that has any reasonable possibility of being a permanent remission, a cure based on the administration of conventional treatment as it's administered today."

According to Dr. Zatzkin, the promptness of the diagnosis of low-grade, non-Hodgkin's lymphoma is important because it correlates with the potential for cure.

"If this disease is discovered at Stage I or II disease, we've indicated that the potential exists to cure it. If the disease progresses sequentially starting in a limited

area and ultimately disseminating or spreading, catching it early gives a patient a chance to be cured; catching it late eliminates the chance to cure and the patient will die of the disease."

The potential for cure is "greater than 50 percent" in Stage I.

Dr. Zatzkin stated that most persons with non-Hodgkin's lymphoma are not diagnosed until the disease is in Stage IV. It is his belief that the "normal manner of evaluating patients in this country, using our present technologies, does not lend itself to our discovering this disease earlier in its natural history." He viewed Dr. Aldoroty's annual chest X-rays as providing a unique opportunity to diagnose the disease at an earlier stage. On account of the serial chest X-rays, Dr. Zatzkin believed "this case represents an instance in which we might have been able to enter the natural history of this disease at a substantially earlier point and make a diagnosis."

Dr. James Tourje testified on behalf of the plaintiff as an expert in radiology. He testified that standards of approved medical practice are "what the bulk of individuals practicing in that specialty would do practicing due diligent care." They apply to doctors in the hospital setting, the same as in any other setting. They also apply to the radiology staff persons, file clerks, medical technologists, and secretaries. Radiology standards promulgated by the American College of Radiology include the following: " 'Comparison with previous . . . examinations and reports when possible are a part of the radiologic consultation and report and optionally may be a part of the "impression" section.' " Dr. Tourje explained that the X-ray films and reports are considered medical records and that they have to be maintained so that comparison films are available.

He testified that the 1981 report of Aldoroty's health audit chest X-ray complies with the applicable standard in that the last sentence shows comparison of past and present exams: "There has been no change since previous exam." The report on Aldoroty's 1983 chest X-ray also notes comparison of past and present: " 'Normal chest without change since 6-5-81.' " After examining Aldoroty's chest X-ray reports for 1985, 1987, 1988, 1989, and 1990, Dr. Tourje testified that comparison was stated on each one. The report from September 1991, however, did not show that compar-

ison had been made. For that reason, Dr. Tourje testified, the report does not comply with the applicable standard of care. Moreover, he testified that he disagreed with the findings. The September 1992 report also lacks a comparison. The report from September 1993, when the abnormality was noted, makes a comparison.

Radiology reports are part of a patient's medical record. The Department of Radiology at Wesley serves three classifications of patients—inpatients, outpatients, and emergency room patients. The term used for the physicians who participated in Wesley's Physicians Appreciation health audit were "ambulatory care patients," *i.e.*, outpatients. Aldoroty's medical record number at Wesley was 81022039, which dated from his admission as a patient in 1981. The space on Aldoroty's 1991 chest X-ray report where his medical record number would be is blank. His medical record number is included on the report of his 1992 chest X-ray.

The person who was administrative director of the Department of Radiology at Wesley during the period at issue testified that the Wesley radiology staff "racked the film for the radiologist." That phrase described

"taking the patient's previous films, if any existed, the previous reports, the current request for the current examination and the films for the current examination, putting those together in a package so the radiologist, when they made the interpretation of the day's films, had the previous films, if there were any available for review."

All films belong to Wesley and are stored and retrieved by it. Films are kept in an envelope or jacket on which X-ray examinations and dates are recorded along with the patient's name and medical record number. The jacket for Aldoroty's films lists chest X-rays in 1983 and 1985 through 1993.

Dr. Tourje testified that it was the hospital's duty to provide the radiologists with each patient's film jacket. He also testified that the radiologist has a duty to make sure that the hospital has made the patient's film jacket available. He knew of no hospital where the radiologist physically retrieved the films, but in every hospital the radiologist can tell a staff person to do so. Dr. Tourje testified that if there are previous films but they have not been retrieved from storage and made available to him at the time he is reading

new films, he does not dictate his report on the new films until the others are made available to him. He testified that this was standard practice for a radiologist. His explanation for the practice is that "there may be disease which is hidden on the current exam which is evidenced only because of comparison with a previous chest film." Reading the current film without comparing previous films would be deviating below an acceptable standard of care.

Dr. Lohnes is a radiologist with Wichita Radiological Group, which provides radiology services to Wesley by contract. He was one of the radiologists who read Aldoroty's 1991 chest X-ray. He testified that when he goes into the room where films are set up for his examination, there will be an envelope (jacket). If there are no previous films, the envelope will be new. If there are previous films, the envelope will list them. If there is no envelope, he would "go out and ask the clerical staff out front and ask them to track it down." He would not read the current films without having previous films tracked down because "having prior films increases your accuracy." He agreed that this was standard operating protocol at Wesley. The same procedure is used for Physicians Appreciation health audits. He testified that he compared Aldoroty's previous films with the 1991 film, even if comparison was not noted in the report. He testified that he would have followed the standard practice and the lack of mention of comparison in the report would have been due to his radiology group's decision to use a "canned report" when an X-ray was negative, *i.e.* a normal study. He said, "in an attempt to ease the transcription problems and to try to improve the accuracy of reports, that if there was a negative film, we would use the negative report that was already in the computer system."

Dr. Lohnes testified that, even with hindsight, he believed that the negative report for the 1991 chest X-ray was correct. He measured a 3-millimeter difference between the aortopulmonary window in the 1990 and 1991 films. He believed that the difference could be accounted for by different timing in the respiration or cardiac cycles from one film to the other. He described the difference as falling "within [the] normal range of variability."

Dr. Breckbill is a radiologist with the Wichita Radiological Group. He read Aldoroty's 1992 chest X-ray. He testified that the 1991 film was available to him when he read the 1992 film. He also testified that at the time of trial, he continued to believe the negative report for the 1992 chest X-ray was correct.

Dr. McGuire is a radiologist with the Wichita Radiological Group. He testified that the radiologists would not dictate a report on current films until they had the jacket. He explained that the old films and information on the jacket are needed "in order to make a dictation." He testified that he would never, in a none-mergency situation, read films without a jacket. With regard to comparing old and new films, he testified: "There are some things that are easier to perceive having old films to compare with first with the new ones. And so anytime there are old films available, we always try to look at them because it's very important in terms of the accuracy of our diagnosis." He also testified that the absence of any mention of comparing films in the 1991 and 1992 reports did not mean that no comparisons were made. It was due, instead, to the group's decision to use the canned negative report.

Wesley raises three issues on appeal, all challenging the validity of the jury's verdict:

1. Was the verdict contrary to the evidence?

2. Was the verdict a product of the jury's improperly holding Wesley liable, in whole or in part, for the radiologists' negligence?

3. Was it reversible error for the trial court to instruct the jury that Wesley is responsible for the negligence of the radiology staff?

Wesley first contends that the basic elements of negligent tort liability were not established. Aldoroty's theory of negligence against Wesley was that the hospital negligently managed its Physicians Appreciation health audits, thus causing his cancer to be undetected until it had become incurable. In terms of the elements of liability, Aldoroty sought to prove that Wesley had a duty to manage its health audits to protect him from his injury, that Wesley failed to perform that duty, and that Aldoroty's injury was the proximate result of Wesley's failure. See, *e.g., Mellies v. National Heritage, Inc.,* 6 Kan. App. 2d 910, 912, 636 P.2d 215 (1981).

It is agreed that Wesley's duty was to manage its health audits so that prior films were available to the radiologists for comparison. Wesley contends that there was insufficient evidence to show that it failed to do so. Wesley further contends that, even if there were sufficient evidence to show that it failed to make prior films available to the radiologists for comparison, that failure was not the proximate cause of Aldoroty's injury.

This court's role was succinctly stated in *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 361-62, 837 P.2d 330 (1992):

"When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal."

There is no direct evidence that Wesley failed to make Aldoroty's prior films available for comparison. From the absence of any mention of comparisons in the 1991 and 1992 reports, it reasonably could be inferred that prior films were not available for comparison. The radiologists who read Aldoroty's 1991 and 1992 chest X-rays, however, testified that prior films were available and compared. They explained the absence of any note of comparisons on the 1991 and 1992 reports as being due to their using canned reports.

Aldoroty directs the court's attention to other aspects of the proof. Aldoroty contends that various witnesses were not credible, but for our purposes the witnesses will be assumed to be credible.

Aldoroty asserts that there was evidence that the standard of care for the radiologists required their noting any comparisons in the X-ray reports. The portions of the record he relies on, however, do not support the assertion. He cited the following two paragraphs of the statement of facts in his appellee's brief:

"48. Radiologists have a duty to report the comparison. . . . Dr. McGuire followed this standard practice.

. . . .

"64. Radiologists have a duty to report the comparison. . . . Dr. Breckbill followed this standard practice."

The testimony referenced is by Dr. McGuire. He was asked, "Now, when prior films do exist, then it is the standard practice—it's the standard practice for you to note it and to document it when dictating the X-ray report; is that correct?" He answered, "In the . . . routine use of dictations for patients, in general, yes." Dr. Breckbill is not mentioned. Dr. McGuire also was asked, "Now, there's been a question in the case about the fact that in previous years, that is previous to 1991, there is mention made in the reports about looking at the old films, but in 1991 and 1992, there is no mention of that. Could you tell the jury why that is?" He answered:

"We decided that the idea of the—of the routine reports is to prevent any transcription—the process of typing and the potential errors for transcription so that if we thought the exam was negative, we would give it the routine A report and leave it at that because we'd always have the old films there, and that was always understood. So we just leave it at that."

Aldoroty calls to the court's attention that "each of Dr. Aldoroty's other reports report comparisons." This evidence, however, has no tendency to make it more likely than not that the lack of any mention of comparisons signifies that no comparisons were made. McGuire testified that the radiology group's decision to use canned reports accounted for the difference between the pre-1991 reports and the 1991/1992 reports. With regard to the mention of comparisons in the 1993 report, McGuire explained that there was an abnormal finding in 1993 so that the canned report for a negative finding was not used.

Aldoroty asserts that "other reports from 1991 and 1992, including MSRW [Medical Staff Recognition Week health audit] reports, report the comparison." He cites the following two paragraphs from his statement of facts:

"50. Dr. McGuire documented comparisons even when the report was normal.

. . . .

"66. Dr. Breckbill documented comparisons even when the report was normal. . . . Dr. Breckbill reported comparisons on 1992 MSRW normal chest X ray reports."

The testimony of Dr. McGuire that is cited concerns a non-MSRW report he made in June 1993. It does not support the specific assertion, but more importantly, it does not appear to have been

established that the finding for that report was negative. If the finding was not negative, the group's policy of using canned reports would not apply. Plaintiff's counsel told Dr. McGuire that he had a report of a chest X-ray of "another patient in 1993." Defense counsel continued, "And the impression is no significant change from the prior study is evident; and you note the comparison is made to the study of 6-26-93, which would be two days earlier; is that correct?" That is all the information we (and the jury) have about this report. The testimony of Dr. Breckbill is another matter. The first sentence of Aldoroty's assertion is accurate, but the second is not. Here are the pertinent questions and answers, beginning with a question about Aldoroty's 1992 chest X-ray report:

"Q. Now, I think you have reported this 1992 X ray report out as negative, have you not?

"A. Yes.

"Q. And there is no documentation of a prior film; is that correct?

"A. Correct.

"Q. And it is your usual practice to go ahead and to document when you compare a prior film?

"A. Correct.

"Q. And in this case there was no documentation of the prior film because his film was a film taken of a Physicians Appreciation Program patient; is that correct?

"A. Correct.

"Q. So with Physicians Appreciation Day program patients, at least in 1992, those patients, like Dr. Aldoroty, did not have the full dictation or have the full comparison noted on the film report itself; is that correct?

"A. Correct.

"Q. So in '92 when you were dictating, if it was a regular patient you would note—document the prior film for comparison purposes; is that correct?

"A. Would you—I lost you there.

"Q. In 1992 if you were dictating for a regular patient, you would note and document on the film report the comparison; is that correct?

"A. Yes.

"Q. But for Physicians Appreciation Day patients you used the canned response—

"A. Correct.

"Q. —is that correct? And you know—and if you would have another physician in 1992 who went through the Physicians Appreciation Program and if he had a negative or abnormal [sic] chest X ray, you would expect that to be a canned response too; is that correct?

"A. Yes.

"Q. Because in 1992 physicians who participated, if they had a normal chest X ray, they had a canned response; is that correct?

"A. Yes, sir.

"Q. And that's the reason that there's no notation of the review of prior films in 1992 on your part; is that correct?

"A. Yes, sir.

"Q. Let me hand you another doctor's chest X ray report in 1992, Exhibit 4.13, and this looks like we don't have a transparency on this one. This is a Physicians Appreciation Day Program patient; is that correct?

"A. Yes, sir.

"Q. And the doctor is Dr. Dan Francisco; is that correct?

"A. And it was done in 1992, about this same week that Dr. Aldoroty had his Physicians Appreciation chest X ray; is that correct?

"A. Yes.

"Q. And here Dr. Francisco, who was a Physicians Appreciation Day patient like Dr. Aldoroty, Dr. Francisco didn't get the canned response, did he?

"A. No.

"Q. Dr. Francisco, there is documentation of prior films being pulled and compared; is that correct?

"A. I would assume that's what he was talking about.

"Q. So in this case Dr. Aldoroty—there's no documentation of prior films being pulled and compared and documented; is that correct?

"A. Correct.

"Q. And he was a Physicians Appreciation Program patient; is that correct?

"A. Yes, sir.

"Q. Dr. Francisco was likewise a Physicians Appreciation Day Program patient; is that correct?

"A. Yes.

"Q. He got the chest X ray—his was negative—but this time they document the review and the comparison of prior films; is that correct?

. . . .

"A. That's correct. And I can tell you why—

"Q. (BY MR. HUTTON) Why, sir?

"A. —if you'd like to know. Because Dr. Reisenauer was a resident at the time. He was not on the staff. And I would imagine Dr. Ahlstrand designated Dr. Reisenauer to report the cases.

"Q. Okay. So a resident would do it a little differently, then; is that what you're telling this jury?

"A. He—yes. He probably was unaware that we were trying to save a little time."

In summary, Dr. Breckbill's testimony differed from that of the other radiologists in that he said he used the canned reports for negative findings for health audit patients but not for regular pa-

tients. His testimony in this regard, however, has no tendency to make it more likely than not that the lack of any mention of comparisons signifies that no comparisons were made for Aldoroty. Moreover, he explained that a 1992 health audit chest X-ray report with a negative finding and comparisons noted was not made by a radiologist in the Wichita Radiological Group.

Aldoroty asserts that Breckbill's conversations with Francisco "show that no comparisons were made in 1991 and 1992." He refers to testimony about a discussion which took place in the radiology department at Wesley in 1993 when Dr. Francisco, Dr. Bauman, and Dr. Breckbill were present. Francisco testified that when he learned of the abnormal finding on the 1993 X-ray, he went to the viewing room in the radiology department at Wesley and looked at the X-ray film with Dr. Breckbill. They also looked at films from earlier years. Dr. Bauman, a radiation oncologist at Wesley, looked at the films with them. He was "very emphatic," "very confident," and "very positive" that the 1993 film showed an abnormality, and he recommended further evaluation. Francisco also testified that when they looked at the 1992 and 1991 films, "it was obvious that the abnormality was way back in 1991." When asked if the prior films had been pulled for comparison each time a current film had been read for Aldoroty, Francisco stated, "[W]e don't know because I remember one of the radiologists—well, whoever it was, it was one of the two, there were only two there— saying that if we had this 1991 film, and we had only that, if we didn't have the one to compare it to, it really made it difficult. And if they weren't pulled up, it would really be difficult." He added that if the 1990 X-ray had been available for the radiologist's comparison, the 1991 film "probably could have [been] interpreted correctly." Asked if he was given the impression during this discussion in the radiology department that the cancer had been missed for 2 years, Francisco testified:

"Right, and it wasn't my opinion—

    . . . .

"[H]ad the 1990 film been made available by Wesley to the radiologist, it was their own radiologist from Wesley Hospital. That for whatever reason, it was suggested that maybe the technicians in Wesley did not bring up the X-rays from

1990 when the '91 was available. When they looked at '92, chances are they didn't have the '91. And without the preceding year, it really—you're dealing with a can of worms, and that's exactly what has happened."

Francisco did not say which of the two Wesley radiologists suggested that prior films had not been made available for comparison. It seems very unlikely that this suggestion would have been made by Dr. Breckbill, who testified that the 1991 film was available to him when he read the 1992 film and that he continued to believe at the time of trial that his negative report for the 1992 chest X-ray was correct. If this suggestion were made by Dr. Bauman, it would be nothing more than speculation. In fact, it might be even less. Dr. Bauman's casting the responsibility for Dr. Breckbill's oversight onto the support staff when in conversation with Dr. Breckbill would not be an unheard of social accommodation. Nonetheless, this testimony of Dr. Francisco was heard by the jury, over objection, and may be said to constitute some evidence, although quite weak, that prior films were not available for comparison when the 1991 and 1992 films were read.

Finally, in this regard, Aldoroty asserts that Wesley's "employees prepared and hung the X rays for radiologist interpretation during MSRW, assuming complete responsibility for the task." If it had been established that no films were made available for comparison in 1991 and 1992, this assertion would be significant for assigning liability. It does not make it more or less likely, however, that films were made available.

In deciding whether the evidence on Wesley's failure to perform its duty supports the verdict, the court must consider the evidence in the light most favorable to Aldoroty and refrain from weighing the evidence or passing on the credibility of the witnesses. As noted, the evidence supporting the verdict is the failure to indicate a comparison to the 1991-92 chest X-ray and Dr. Francisco's testimony. Viewing the evidence as prescribed, there is evidence, albeit weak, to support a finding that Wesley failed to perform its duty and thus to support a finding that Wesley was at fault.

Wesley also contends that all the evidence points to the conclusion that any failure by Wesley was not the sole proximate cause of Aldoroty's injury, the loss of a chance of recovery. The hospital

relies on *Tinkler v. U.S. by F.A.A.*, 982 F.2d 1456 (10th Cir. 1992), (applying Kansas law) for the proposition that in order for the hospital to be held liable, any negligence on its part must be the sole proximate cause of the plaintiff's injury.

Wesley's reliance on *Tinkler* is misplaced because *Tinkler* involves intervening and superseding causes of the injury, materially different legal principles from those applicable in the present case. Even if *Tinkler* were applicable, the proposition that Wesley urges on the court could not be extracted from that case. Tinkler died in the crash of a small plane. The Dodge City Flight Service Station's negligence in failing to provide weather information when requested was held to be remote and not directly linked to the crash. The pilot's negligence in failing to obtain preflight weather information, in failing to seek weather information from an alternative source, and in particular in flying at extremely low and unsafe altitudes of 100 to 200 feet was an intervening and superseding cause of the crash. The pilot's flying was characterized as grossly negligent, and his conduct cut off liability for the earlier negligence by the flight service person. Thus, failure to provide weather information was not the legal cause of the crash. 982 F.2d at 1469-70.

In the present case, the jury was not instructed on the principles of intervening and superseding acts of negligence. Instead, the jury was instructed on comparative fault, and the verdict form allowed the jury to compare the fault of Wesley, the three radiologists, and Aldoroty's personal physician. Wesley has not appealed the application of comparative fault.

The trial court granted partial summary judgment to Wesley on the issue of vicarious liability. Aldoroty did not cross-appeal the issue. On the basis of a written contract between Wesley and the radiologists, the trial court stated with regard to the radiologists' status:

"The circumstances and facts raised by the plaintiff . . . are insufficient to establish that there was an employer/employee or principal/agent relationship between defendant Wesley Medical Center and the defendant physicians, and are insufficient to overcome the clear and plain meaning of the contract between defendant Wesley and the defendant physicians dated June 7, 1977 which states at Paragraph 9.1 that an independent contractor relationship exists."

The trial court found that the hospital and the radiologists are health care providers as that term is used in K.S.A. 1997 Supp. 40-3403(h). On the basis of the statute, the trial court concluded that Wesley could have no vicarious liability or responsibility for any injury to plaintiff arising out of the radiologists' rendering of or failure to render health care services to plaintiff.

There is no contention that the trial court's instruction on this facet of the hospital's liability was not in accord with the statutes and with the entry of partial summary judgment. The jury was instructed that "Wesley cannot be found negligent for the acts of any physician providing care and treatment to Neil Aldoroty."

Wesley's contention on appeal seems to be that the jury did precisely what it was instructed not to do. Wesley contends that the jury held the hospital liable, at least in part, for the failures of the radiologists. In other words, in addition to contending that the verdict is contrary to the evidence, Wesley contends that it is contrary to the law. Aldoroty refuses even to label Issue 2 as a separate issue. He contends that it is exactly the same as Issue 1, but that Wesley has attempted to couch it in terms of law instead of facts so as to change the standard of review to unlimited.

Wesley's contention is that "[p]laintiff's theory and the facts dictate that at least some negligent act by a physician was required for injury to result." What Wesley seems to be arguing is that it cannot be the only one at fault when the evidence showed fault on the part of the doctors. What Wesley actually argues, though, is that it cannot be held liable unless it really is 100% at fault. Wesley contends that the verdict arguably could have been rationalized if 99% of the fault had been assigned to the hospital, but with 100% of the fault assigned to the hospital, the only possible explanation is that the jury held it liable for the radiologists' negligence. In other words, the argument continues, "Aldoroty would have no claim against [Wesley] if one of the radiologists had not negligently treated him by misreading an X-ray in 1991 or 1992 or both." This is where Wesley's argument goes astray. The phraseology is from *McVay v. Rich*, 255 Kan. 371, 874 P.2d 641 (1994), which involves the corporate negligence theory. Aldoroty did not proceed against

Wesley under the corporate negligence theory, and it has no application in this case.

The issue before the court in *McVay* was whether Kansas courts would adopt the corporate negligence theory in regard to hospital liability, and the court concluded that it was prohibited from doing so by K.S.A. 65-442(b) and K.S.A. 40-3403(h). Under the usual principles governing employer/employee and principal/agent relationships, a medical care facility would be subject to liability for negligent acts of an employee or agent. In contrast, a medical care facility would not be subject to liability for an independent contractor's negligent acts, and physicians customarily are independent contractors. The theory of corporate negligence developed as a means of subjecting a hospital to liability in the event that an independent contractor/physician negligently injures a patient. Unlike the theory of employer/employee liability, however, the theory of corporate negligence does not subject the hospital to liability for the physician's negligent act. Instead, it subjects the hospital to liability for its own negligent act, that is, for negligently extending staff privileges to a physician who was not competent and careful. In other words, the hospital's negligence would lie in selecting and retaining the physician, and the physician's negligence would lie in acts or omissions of patient care.

Under the corporate negligence theory, a hospital has an independent duty to its patients to ensure their health by not entrusting the work of health care to an independent contractor/physician who is not competent and careful. Extending staff privileges to an incompetent and careless physician would be a breach of the duty, and the injuries suffered by the patient at the hand of the incompetent and careless physician would be caused by the hospital's breach. This is not vicarious liability for an independent contractor's torts; it is the hospital's liability for its own negligence. Nonetheless, this court rejected the theory on the ground that "McVay would have no claim against the hospital if Rich had not negligently treated her." 255 Kan. at 377. This language (rationale) seems to have misled Wesley into thinking that something more than the corporate negligence theory was being rejected.

*McVay* is confined to application to the corporate negligence theory. If applied in circumstances such as those in the present case where several actors allegedly contributed to causing the patient's injury, it negates the legitimate theory of liability. Aldoroty did not seek to hold Wesley liable for his physical harm caused by the hospital's negligence in selecting and retaining the radiologists, as McVay had sought to hold Memorial Hospital liable. The duty McVay alleged Memorial owed her was to select and retain only competent and careful physicians. That duty arose in a function completely separate from the surgical services provided by the hospital. The duty Aldoroty alleged Wesley owed him was to retrieve prior X-rays from storage and furnish them to the radiologists, whose duty it was to compare the present and previous films. Wesley's duty and the radiologists' duty were close links in the same small chain, and it was up to the jury to compare their fault. *McVay* is simply inapplicable in the present case. Wesley also cites *Lemuz v. Fieser*, 261 Kan. 936, 933 P.2d 134 (1997). It, too, involves the corporate negligence theory and is distinguishable from the present case.

Although we reject Wesley's argument that the verdict is contrary to the law, we find merit in its argument that the verdict is contrary to the evidence. The jury, in disregarding the testimony of all the doctors and finding Wesley 100% at fault, created a "Catch 22" situation. We did find there is evidence to support a finding that Wesley is at fault; however, it does not support a finding that Wesley was 100% at fault. As previously noted, a reasonable inference could be made from the absence of a notation in the 1991 and 1992 reports and Dr. Francisco's testimony that Wesley failed to make the reports available. It is equally reasonable to infer that Wesley made the reports available and the doctors failed to make the comparison. To find Wesley at fault, the jury had to reject the testimony of the three examining radiologists and Wesley's radiology staff. It appears it did just that. However, to find Wesley 100% at fault, the jury would have to reject all the medical testimony, including the plaintiff's expert, Dr. Tourje. Dr. Tourje testified that it is a breach of accepted medical standards for the radiologists to read Dr. Aldoroty's chest X-rays without comparison

to prior reports. He further opined that failure to note the comparison on the report was also a breach. There is no dispute that the prior reports were available in the hospital and that the radiologists read the 1991 and 1992 X-rays. The jury chose not to believe the doctors' testimony that they did compare the prior X-rays, but the jury cannot disregard the undisputed facts or the uncontroverted testimony of Dr. Tourje that it is a breach of applicable medical standards for a radiologist to make his or her report unless the prior reports are present and, if not, retrieve them from storage. There is no evidence to indicate the radiologists were misled as to Aldoroty's status as a prior patient at Wesley. Absent such evidence, it is a violation of medical standards of care to proceed without the prior report available for comparison. In addition, although Dr. Breckbill disagreed, Dr. Tourje testified the 1992 film was abnormal without comparison to the prior X-rays. In Tourje's opinion, Dr. Breckbill was negligent in reporting the 1992 X-ray as negative.

The finding by the jury that only Wesley was at fault could have been precipitated by the trial court's instructing the jury that Wesley was responsible for the negligence of the radiology staff. The following statement of an appellate court's standard of review in matters involving civil jury instructions appears in *In re Application of City of Great Bend for Appointment of Appraisers*, 254 Kan. 699, 713, 869 P.2d 587 (1994): "If the jury instructions, read as a whole, fairly instruct the jury on the law governing the case, are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal." Otherwise, the court must be firmly convinced of a real possibility that the jury would have returned a different verdict if it had been instructed differently. *Noon v. Smith*, 16 Kan. App. 2d 818, Syl. ¶ 2, 829 P.2d 922 (1992).

In the present case, the jury was instructed: "Wesley can act only through its officers and employees. The negligence of its radiology staff acting within the scope of their employment is the negligence of Wesley. However, Wesley cannot be found negligent for the acts of any physician providing care and treatment to Neil Aldoroty." Wesley states that the instruction was based on PIK Civ.

2d 7.13, which provides: "( . . . Name of party . . .) is a corporation and can act only through its officers and employees. The (negligence) (conduct) of an officer or employee acting within the scope of his (employment) (authority) is the (negligence) (conduct) of the corporation."

Wesley first contends that the instruction conflicts with K.S.A. 1997 Supp. 40-3403(h) and K.S.A. 65-442(b) and the comment to PIK Civ. 2d 7.05. This argument is a continuation of the argument made in Issue 2 to the effect that the overbroad language in *McVay* can be used to extend the statutory prohibition of derivative liability into a general prohibition of comparative fault in medical malpractice actions. It is not a sound argument.

Wesley also contends that the instruction is simply misleading. Wesley contends that there were reasons why the jurors reasonably could have believed the radiologists were "radiology staff" and, therefore, have held Wesley responsible for the negligence of the radiologists in accord with the jurors' (mis)understanding of the instruction.

Wesley asserts that it objected to the instruction, but its record references are to a post-trial motion and hearing. Aldoroty asserts that not only has Wesley inaccurately represented that it objected to the instruction, but also Wesley actually proposed the instruction and invited error. The record shows that Wesley proposed the following instruction: "Wesley can act only through its officers and employees. The negligence of its employees acting within the scope of their employment is the negligence of Wesley. However, Wesley cannot be found negligent for the acts of any physician providing care and treatment to Neil Aldoroty." The only difference between Wesley's proposed instruction and the court's instruction to the jury is in the second sentence. Wesley suggested: The negligence of its *employees* acting within the scope of their employment is the negligence of Wesley. The court instructed: The negligence of its *radiology staff* acting within the scope of their employment is the negligence of Wesley. The change was made at the instruction conference. The trial judge prepared a packet of proposed instructions that were discussed at the instruction conference. That packet of proposed instructions does not seem to be in the record on

appeal. It appears from the transcript of the conference that the packet contained an instruction that corresponded to Wesley's proposed instruction except that in the second sentence the court used *nursing staff* instead of *employees*. The following discussion about the instruction was recorded:

"THE COURT: 'Wesley can act only.'

"MR. HUTTON [Aldoroty's attorney]: Your Honor, what is most prominent here is we make no contention against the nursing staff; it's the radiology staff.

"THE COURT: Ah. Good point. That's a good point. I'm going to change that to 'radiology.'

"MR. HUTTON: Request the second [*sic*] sentence be stricken then. Argues the defendant's case. It's argumentative. It makes their case for them. That's what we'll hear in closing arguments.

"THE COURT: Well, but it's the correct statement of the law. They can't be— if the negligence is only of the doctors, they—it's not on Wesley. It has to be the radiology staff.

"MR. HUTTON: It is the correct statement of the law.

"THE COURT: Oh, okay. I see. Just you never say die, right?

"MR. HUTTON: That's a tad bit argumentative, but it is strictly the law.

"MR. GIBSON [Wesley's attorney]: With the change of 'nursing' to 'radiology,' we have no objection to this instruction."

From this exchange, it is clear that the ultimate wording of the instruction was the result of contributions by each of the parties and the trial judge. It also is clear that Wesley did not object to the instruction, but neither did Wesley suggest that "radiology staff" should be used instead of "employees."

Wesley contends that the instruction was confusing because "radiology staff" could be interpreted to include the radiologists. Aldoroty counters that the last sentence would clear up any possible confusion by distinguishing physicians from radiology staff. Wesley argues that the last sentence might be interpreted as distinguishing between Aldoroty's personal physician and his cancer-treating physicians and the radiologists, who were reading health audit X-rays rather than "treating" the plaintiff. This interpretation would focus on the descriptive phrase "providing care and treatment to Neil Aldoroty." The wording of the last sentence was suggested by Wesley, but the suggestion was made before "radiology staff" was inserted. Without the problematic phrase in the second sentence,

there would be little, if any, reason to scrutinize the third sentence for help in interpreting the second. For this reason, it would seem unreasonable to preclude Wesley from complaining on appeal that the third sentence does not clarify the distinction between "radiology staff" and radiologists.

Wesley contends that lawyers' and witnesses' use of the term "staff" in referring to doctors with staff privileges at the hospital could have contributed to the possibility of the jury being confused by the instruction. Wesley points out a number of instances when the jury heard the doctors referred to as staff and staff radiologists and members of the medical staff. Aldoroty insists that in statements of counsel and testimony of the witnesses the distinction always was drawn between the radiologists and the hospital employees. Many of the instances he cites, however, include the term staff with reference to the radiologists, and the distinction does not appear to have been so clear that laypersons could not easily have been confused. In fact, one prominent instance, "Medical Staff Recognition Week," was repeated over and over again in this trial.

As evidence that the jury was confused by the instruction, Wesley points out that during deliberations, the jury sent out the following question: "Why are Drs. Breckbill, Lohnes, and McGuire listed separately from Wesley Medical Center in question No. 2[?]" Questions 1 and 2 on the verdict form stated:

"1. Do you find anyone to be at fault? The term 'anyone' includes the defendant hospital.

. . . .

"2. If you answered Question 1 'yes,' then considering all of the fault at 100%, what percentage of the total fault is attributable to each of the following persons:

| | | |
|---|---|---|
| Wesley Medical Center | (0% to 100%) | ___ % |
| David Breckbill, M.D. | (0% to 100%) | ___ % |
| John Lohnes, M.D. | (0% to 100%) | ___ % |
| Charles McGuire, M.D. | (0% to 100%) | ___ % |
| Dan Francisco, M.D. | (0% to 100%) | ___ %" |

The trial judge's response to the jury's question was: "Please reread the instructions, including instructions #10 + #20, and reconsider all of the evidence." Instruction No. 10 is the complained-of instruction. Instruction No. 20 stated:

"In interpreting the last instruction, it may help you to keep the following things in mind:

"Your first obligation is to determine if any party is at fault.

"Next, assign a percentage of fault to each party you find to be at fault.

"For a party not at fault, show 0% on your verdict form

"For any party at fault, show 1% to 100%, depending on your finding, on your verdict form.

"If any parties are found at fault, the fault of all parties, when added on your verdict form, must total 100%.

"If you find any party to be at fault, you will next determine the amount of damages, if any, sustained by any party claiming damages[.]

"The parties to whom you have the discretion to assign fault are:

David Breckbill, M.D., John Lohnes, M.D., Charles McGuire, M.D., Dan Francisco, M.D. and Wesley Medical Center.

"The party to whom you may award damages is:

Neil Aldoroty, M.D."

In the blanks in Question 2 of the verdict form, the jury inserted 100 as the percentage of Wesley's fault and 0 as the fault of each of the doctors.

The jury's question reveals a fundamental confusion about the scope of the hospital's responsibility. Aldoroty, though, seems to contend that there can be no error because the trial judge's answer cleared up the confusion, or, in the alternative, that Wesley's failure to object to the trial judge's answer ratified it. He provides no authority for the proposition, however. The record contains the transcript of a telephone conference call in which the trial judge talked with counsel for both parties about how to answer the jury's question. It shows that the trial judge suggested answering the question by referring the jurors to Instruction No. 10, the complained-of instruction. Wesley's attorney responded, "I think that's probably correct, and maybe also 20." Aldoroty's attorney wanted the jurors referred to the evidence, too. The trial judge incorporated all suggestions and directed the jury's attention to Instruction No. 20 as well as No. 10 and to the evidence as well as to the instructions.

Both parties cite cases in which error was premised on an answer given to a question asked by the jury during deliberations. The issue in this case, though, is whether an instruction is erroneous. The jury's question is an indicator of the jury's confusion about the

instruction's subject matter. The trial judge's response to the question would be relevant only if it could be clearly ascertained that the response cleared up the confusion. That is not the case here. We conclude the jury could reasonably have been misled by the instructions. While the jury is free to find fault if supported by the evidence, a finding that Wesley was 100% at fault cannot be reconciled with the record. The jury can rely upon only expert medical testimony in determining if the radiologists complied with the appropriate standard of care. The jury was not free to totally ignore the uncontroverted expert testimony that the radiologists were negligent. The finding by the jury that Wesley was 100% at fault is either the result of the jury's rejecting the uncontroverted evidence that the radiologists violated the standard of care or holding Wesley, at least in part, responsible for the negligence of the examining radiologists. Consequently, the verdict is either contrary to the evidence or the instructions, and a new trial is required.

Reversed and remanded for a new trial.

LOCKETT, J., concurring and dissenting: I concur with the majority's determination that the verdict is either contrary to the evidence or the instructions, and a new trial is required.

In reaching its conclusion, the majority notes:

"When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal."

After stating the proper rule for appellate review, the majority disregards the function of an appellate court by speculating, reweighing the evidence, and commenting on the credibility of witnesses. The following statement exemplifies the majority's abandonment of the rules of appellate review:

"Francisco did not say which of the two Wesley radiologists suggested that prior films had not been made available for comparison. *It seems very unlikely* that this suggestion would have been made by Dr. Breckbill, who testified that the 1991 film was available to him when he read the 1992 film and that he continued to believe at the time of trial that his negative report for the 1992 chest X-ray was

correct. *If this suggestion were made by Dr. Bauman, it would be nothing more than speculation. In fact, it might be even less.* Dr. Bauman's casting the responsibility for Dr. Breckbill's oversight onto the support staff when in conversation with Dr. Breckbill *would not be an unheard of social accommodation.* Nonetheless, this testimony of Dr. Francisco was heard by the jury, over objection, *and may be said to constitute some evidence, although quite weak,* that prior films were not available for comparison when the 1991 and 1992 films were read." (Emphasis added.)

The fact that this court found that the verdict was either contrary to the evidence or the instructions, and a new trial is required, prohibits it from weighing the evidence. I must therefore concur in the result but dissent from the majority's abandoning the standard of review.