No. 119,501

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KATY J. BROWN and CHRISTOPHER K. BROWN,
Individually and as Natural Parents and Next Friends of
CARTER KENT BROWN, A Minor,
*Appellants*,

v.

TODD D. TROBOUGH, M.D., JEFFREY M. TEPLY, M.D.,
LINCOLN CENTER OBSTETRICS & GYNECOLOGY, P.A.,
and KANSAS MEDICAL EDUCATION FOUNDATION,
*Appellees*.

SYLLABUS BY THE COURT

1.

In *Cady v. Schroll*, 298 Kan. 731, 317 P.3d 90 (2014), our Supreme Court mandated that K.S.A. 40-3403(h) absolve all health care providers from any responsibilities, including independent liability, where the injured party sought damages that were derivative of and dependent upon another health care provider's professional services.

2.

A plaintiff's theory of liability against a health care provider has no bearing on whether K.S.A. 40-3403(h) will absolve that health care provider from responsibility. Instead, whether K.S.A. 40-3403(h) absolves a plaintiff's suit against a health care provider hinges on whether the plaintiff's injuries arose out of the professional services of another health care provider.

1

3.

Under the facts of this case, K.S.A. 40-3403(h) absolved the doctor who served as the training site director of the residency program from liability for negligent supervision because a resident and a faculty supervising doctor provided the alleged negligent medical services at issue. Thus, any claim against the doctor who served as the training site director was derivative and dependent upon plaintiffs' claims against the resident and the faculty supervisor.

Appeal from Shawnee District Court; RICHARD D. ANDERSON, judge. Opinion filed September 27, 2019. Affirmed.

*Matt Birch* and *Richard L. Budden*, of Shamberg, Johnson & Bergman, Chtd., of Kansas City, Missouri, for appellants.

*Thomas L. Theis*, of Foulston Siefkin, LLP, of Topeka, for appellee Todd D.Trobough, M.D.

*Lisa McPherson* and *David S. Wooding*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellee Jeffrey M. Teply, M.D.

Before GREEN, P.J., STANDRIDGE, J., and MCANANY, S.J.

GREEN, J.:  This litigation arises out of a medical malpractice action for birth injuries to Katy J. Brown and Christopher K. Brown's minor son, Carter Kent Brown. The Browns initially sued Stormont-Vail Hospital, as well as Dr. Todd Trobough, the attending obstetrician, and Dr. Jennifer Schuchmann, the resident physician, who both participated in the labor and delivery of Carter. The Browns settled their claims against Dr. Schuchmann and the hospital.

The Browns then amended their petition and sued Lincoln Center Obstetrics & Gynecology, P.A., and Jeffrey M. Teply, M.D., for injuries to Carter. The trial court

2

dismissed the claims against Lincoln Center for two independent reasons: (1) that the Browns and Carter were not intended beneficiaries of the contracts that they relied on in support of their claims against Lincoln Center and (2) that K.S.A. 40-3403(h) precluded liability against Lincoln Center for injuries arising out of the rendering of care or failure to render care by the resident physician and the attending obstetrician. The Browns and Carter did *not* seek interlocutory appeal from those rulings.

Similarly, Dr. Teply moved for judgment on the pleadings for two independent reasons: (1) that a duty of care for a physician requires a physician-patient relationship which did not exist here and (2) that K.S.A. 40-3403(h) precluded liability against Dr. Teply because the Browns' and Carter's injuries arose out of the care rendered or failed to be rendered by Dr. Schuchmann or by Dr. Trobough or by both. The trial court ruled that K.S.A. 40-3403(h) barred the Browns' and Carter's claims against Dr. Teply. The trial court did not consider the duty of care issue. This is an interlocutory appeal arising out of the trial court's order granting defendant Teply's motion for judgment on the pleadings and entering judgment in his favor.

Thus, this appeal involves the application of K.S.A. 40-3403(h), which is a provision of the Health Care Provider Insurance Availability Act (Act). This provision absolves health care providers who qualify for coverage under the Health Care Stabilization Fund (Fund) from any responsibility for injuries arising out of the rendering of or the failure to render professional services by other health care providers that qualify for coverage under the Fund.

The Browns' argument hinges on their claim that our Supreme Court applies the statutory scheme of K.S.A. 40-3403(h) differently depending on whether a plaintiff's theory of liability involves corporate negligence. Nevertheless, our Supreme Court rejected this argument in *Cady v. Schroll*, 298 Kan. 731, 746, 317 P.3d 90 (2014). In doing so, the *Cady* court stated the following: "The language of K.S.A. 40-3403(h) does

3

not premise immunity on the type of health care providers involved, the nature of the relationship between the two health care providers, *or the nature of the theory of liability*." (Emphasis added.) 298 Kan. at 746.

Moreover, in discussing the various theories of liability involved in these cases as well as acknowledging that K.S.A. 40-3403(h) seemingly undermines the public policy behind these theories of liability, the *Cady* court clearly pointed out the following:

> "[R]egardless of whether the liability arises from the negligent hiring and supervision of an independent contractor or an employee-employer relationship, the policy behind imposing liability on the principal is the same: making liable the entity or person who was in a position to protect the patient, who profited from the business relationship with the injured patient, and who is often best able to pay for the damages. See *Marquis*, 265 Kan. at 331 (discussing duty to supervise); *McVay*, 255 Kan. at 377 (discussing corporate negligence); *Plains Resources, Inc. v. Gable*, 235 Kan. 580, 590, 682 P.2d 653 (1984) (discussing duty to hire and retain competent employees); see also *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 523, 622 N.E.2d 788 (1993) (discussing policy reasons for recognizing vicarious liability of hospital for acts of independent-contractor physician). We recognize that K.S.A. 40-3403(h) arguably undermines the public policy behind these theories of liability and diminishes the protections otherwise available to patients. But 'courts "are not free to act on . . . [their own] view of wise public policy" in matters governed by legislation. [Citation omitted.] Courts should instead "leave the guidance of public policy through statutes to the legislature." [Citations omitted.]' *In re Marriage of Hall*, 295 Kan. 776, 784, 286 P.3d 210 (2012). Our task is to determine if there is any reason to discern a legislative intent to distinguish between employees and independent contractors or various theories of liability, and we can find none." 298 Kan. at 748.

Here, the facts establish that the Browns seek to hold Dr. Teply responsible for Carter's birth injuries that were derivative of and dependent upon the rendering and failure to render professional services by Dr. Trobough and a resident physician. Thus,

4

we hold that K.S.A. 40-3403(h) bars the Browns' negligence claim against Dr. Teply. Accordingly, we affirm.

On September 12, 2015, early in the morning, Katy went into labor. A resident, Dr. Jennifer Schuchmann, managed Katy's labor. Dr. Todd D. Trobough was the on-call physician during Katy's labor. This meant that Dr. Trobough was the faculty adviser supervising Dr. Schuchmann. This also meant that Dr. Trobough was Katy's attending physician. Dr. Trobough made rounds at the hospital sometime during the morning of September 12, 2015; then he was told of Katy's high risk pregnancy. But after this time, it seems Dr. Trobough left the hospital.

Throughout the day, Dr. Schuchmann and Dr. Trobough continued to discuss Katy's labor through text messages. Then, at 3:45 p.m., Katy was started on Pitocin, a drug that stimulates labor contractions. By 5 p.m., Katy was in the second stage of labor. At 8:04 p.m., Dr. Schuchmann texted Dr. Trobough to come to the hospital for delivery. Dr. Trobough arrived at 8:20 p.m., and Katy delivered Carter at 8:30 p.m.

Tragically, Carter was critically ill when he was born. Carter could not breathe on his own for 14 minutes when he was delivered. He was later diagnosed with Hypoxic-Ischemic Encephalopathy (brain damage due to asphyxiation around the time of birth) and Cerebral Palsy.

Following the delivery, Dr. Trobough texted another Lincoln Center physician that when he arrived in Katy's delivery room, he discovered that "the nurses were monitoring [the] maternal heart rate" instead of both the maternal heart rate and the fetal heart rate during Katy's labor. Once Dr. Trobough discovered this, he immediately delivered Carter.

On June 15, 2016, Katy and Christopher sued Dr. Schuchmann, Dr. Trobough, and Stormont-Vail for negligence personally and on behalf of their son Carter. The Browns

5

asserted that Stormont-Vail was vicariously liable for its nursing staff and other employees "in relation to the care of, or failure to care for . . . Katy and . . . Carter." The Browns asserted that both Dr. Schuchmann and Dr. Trobough violated their duty of care when treating Katy and Carter. Specifically, the Browns alleged that Carter had been "neurologically intact" before the second stage of Katy's labor. They alleged that the defendants' failure "to closely monitor Carter's condition via continuous fetal heart monitoring during the second stage of labor" resulted in Carter's injuries. The Browns requested over $75,000 in damages because of the irreversible negligence that rendered Carter "permanently disabled and forever unable to function independently."

Eventually, Stormont-Vail and Dr. Schuchmann entered into confidential settlement agreements with the Browns. Shortly after entering into those agreements, the Browns moved to amend their petition. The Browns sought to add Dr. Teply, the Lincoln Center Obstetrics & Gynecology, P.A., and the Kansas University Medical Education Foundation as defendants in their amended petition, which the trial court allowed.

In their amended petition, the Browns argued that Dr. Trobough, Dr. Teply, the Lincoln Center, and the Kansas University Medical Education Foundation had a duty to supervise the residents participating in the GME program at Stormont-Vail. The Browns claimed that had Dr. Trobough "been present to properly monitor Katy Brown's second stage of labor, [Dr.] Trobough would have intervened and expeditiously delivered Carter before he suffered permanent neurological damage." The Browns claimed that "[b]ut for [Dr.] Teply's negligence, Carter Brown would not have suffered his birth injuries."

During discovery, the Browns had learned about the residency program at Stormont-Vail. Highly summarized, there were a series of contracts governing the Kansas University Medical Education Foundation's Graduate Medical Education (GME) program in Obstetrics and Gynecology, of which Dr. Schuchmann was enrolled. Under the program, the Lincoln Center agreed to serve as teaching faculty for the residents in the

6

GME program at the Stormont-Vail training site. Lincoln Center employed Dr. Trobough and Dr. Teply. Both doctors served as faculty advisers to the residents in the GME program. Moreover, Dr. Teply served as the training site director of the GME program. Under the contracts governing the program, the training site director had to assist the GME program director "with selection and approve selection of teaching faculty who [would] provide education, evaluation and clinical supervision of the residents/fellows." The contracts also included rules on resident supervision, such as "[t]he physician faculty must be immediately available to a resident if clinical activity is taking place in the operating rooms and/or labor and delivery areas."

The Lincoln Center then moved to dismiss the Browns' claim for failure to state a claim upon which relief could be granted under K.S.A. 60-212(b)(6). The Lincoln Center argued that K.S.A. 40-3403(h) barred the Browns' negligence claim against them because the Browns' request for damages was derivative of and dependent upon Dr. Schuchmann's and Dr. Trobough's medical negligence. In making its arguments, the Lincoln Center relied heavily on our Supreme Court's decision in *Cady*, 298 Kan. 731.

The Browns responded that they "[had] not alleged that [the] Lincoln Center [was] liable for the acts or omissions of others. Rather, Plaintiffs allege that [the] Lincoln Center owed an independent duty to ensure that a licensed Lincoln Center physician was physically present with the resident while she managed the treatment of Katy and Carter Brown." Thus, the Browns argued that Lincoln Center's duty was "not dependent on any alleged vicarious liability of Dr. Trobough or [Dr. Schuchmann]." Next, the Browns cited *Aldoroty v. HCA Health Services of Kansas, Inc.*, 265 Kan. 666, 962 P.2d 501 (1998), and *Glassman v. Costello*, 267 Kan. 509, 986 P.2d 1050 (1999), as examples of when multiple health care providers were held liable in the same case and not barred under K.S.A. 40-3403(h).

7

Following a hearing on the parties' arguments, the trial court granted the Lincoln Center's motion to dismiss. The trial court determined that the Browns' negligence claim against the Lincoln Center was comparable to Cady's negligence claim in *Cady*, which our Supreme Court deemed barred under K.S.A. 40-3403(h). The trial court concluded that the Browns would have no claim against the Lincoln Center if Carter had not been injured by Dr. Schuchmann and Dr. Trobough. Furthermore, the trial court asserted that the *Aldoroty* and *Glassman* cases were distinguishable because "[t]his [was] not a claim in which two separate healthcare providers were separately negligent in providing care and treatment to the patient."

After the trial court granted the Lincoln Center's motion to dismiss, Dr. Teply moved for a judgment on the pleadings under K.S.A. 60-212(c). In his motion, Dr. Teply "incorporat[ed] by reference the arguments and authorities set forth in Lincoln Center's Motion to Dismiss and supporting and reply memoranda, as well as the Court's order granting Lincoln Center's Motion to Dismiss."

The Browns responded by repeating their previous arguments why K.S.A. 40-3403(h) did not bar their negligence claim. They asserted that Dr. Teply had an independent duty to ensure the supervision of residents. The Browns stressed that their "claim against [Dr.] Teply [was] not based on the failures of others." Instead, they alleged that "[Dr. Teply was] responsible for his *own* failure to communicate the rule requiring the presence of an attending faculty-physician . . . ."

Following a hearing on the parties' arguments, the trial court granted Dr. Teply's motion for judgment on the pleadings. The trial court concluded that Dr. Teply had no independent duty to Carter under K.S.A. 40-3403(h). It explained:

"Dr. Tepl[]y's liability arose only from the failure to communicate or train Dr. Trobough concerning his duty to supervise residents. Dr. Tepl[]y had no active role in the treatment

8

of the patient. Carter Brown was Dr. Trobough['s] and the resident['s] patient. It was the treating physician['s] duty to insure the wellbeing of the patient. If Dr. Trobough and/or the resident had not negligently injured Carter Brown the plaintiffs[] would have no claim against Dr. Tepl[]y."

Next, the Browns moved to docket an interlocutory appeal with this court under K.S.A. 60-2102(c) to challenge the preceding order. The trial court granted the Browns' motion, finding that although its order was not otherwise appealable, an interlocutory appeal "may materially advance the ultimate termination of the litigation by allowing the Court of Appeals to address controlling questions of law as to which there [was] substantial ground for difference of opinion." This court granted the Browns' application to docket an interlocutory appeal.

*Does K.S.A. 40-3403(h) Bar the Browns' Negligence Claim Against Dr. Teply?*

On appeal, the Browns allege that K.S.A. 40-3403(h) does not bar their negligence claim against Dr. Teply because they seek to hold him responsible "for the failure to abide by the residency [supervision] rule." They contend that the violation of the residency supervision rule is independent from any other negligence that may have contributed to Carter's birth injuries. Therefore, the Browns argue that K.S.A. 40-3403(h) does not bar them from suing Dr. Teply.

The Browns assert that the trial court wrongly granted Dr. Teply's motion for judgment on the pleadings because it failed to grasp that our Supreme Court has applied K.S.A. 40-3403(h) differently depending on whether the plaintiff sued under corporate negligence theory. The Browns contend that in corporate negligence cases, our Supreme Court has held that K.S.A. 40-3403(h) prevents corporations from being vicariously liable or responsible for injuries arising out of another health care provider's negligence. But they argue that in all other cases "where the theory of liability [was] not one of

9

corporate negligence, the Supreme Court has required a comparison of fault between the health care providers based on each one's contribution to the injury."

Furthermore, they allege that the result of Dr. Teply's dismissal "is unprecedented" because "[Dr.] Trobough now has the opportunity to defend the case by blaming [Dr.] Teply's [supervision] failure, while [they] are unable to recover from [Dr.] Teply for his [supervision] failure [under] the Fund statute." As a result, the Browns ask this court to correct this error by "synthesiz[ing] the application of the Fund statute in corporate negligence cases and non-corporate negligence cases, [] to form a consistent rule out of an ambiguous statute." According to the Browns, this would require this court to interpret K.S.A. 40-3403(h) as allowing "claims against a health care provider when a second provider may blame the first provider."

Dr. Teply responds that as interpreted by our Supreme Court, the language of K.S.A. 40-3403(h) bars the Browns' negligence claim against him. He additionally argues that our Supreme Court precedent establishes that different rules for applying K.S.A. 40-3403(h) do not exist based on whether the plaintiff alleged corporate negligence.

In making their arguments, all the parties rely on the following cases: *Cady v. Schroll*; *McVay v. Rich*, 255 Kan. 371, 874 P.2d 641 (1994); *Lemuz v. Fieser*, 261 Kan. 936, 933 P.2d 134 (1997); *Aldoroty v. HCA Health Services*; and *Glassman v. Costello*. The parties assert that our Supreme Court's analysis on K.S.A. 40-3403(h) in each of the preceding cases supports their respective positions. Nevertheless, a close review of those cases and the parties' arguments establishes that the Browns have misinterpreted our Supreme Court precedent. In short, Dr. Teply's argument is correct: the language of K.S.A. 40-3403(h), as interpreted by our Supreme Court, bars the Browns' negligence claim against him.

10

*Standard of Review*

Appellate courts exercise unlimited review when considering whether the trial court properly granted a motion for judgment on the pleadings:

> "'A motion for judgment on the pleadings under 60-212(c), filed by a defendant, is based upon the premise that the moving party is entitled to judgment on the face of the pleadings themselves and the basic question to be determined is whether, upon the admitted facts, the plaintiffs have stated a cause of action. [Citation omitted.] The motion serves as a means of disposing of the case without a trial where the total result of the pleadings frame the issues in such manner that the disposition of the case is a matter of law on the facts alleged or admitted, leaving no real issue to be tried. [Citation omitted.] The motion operates as an admission by movant of all fact allegations in the opposing party's pleadings. [Citations omitted.]'" *Mashaney v. Board of Indigents' Defense Services*, 302 Kan. 625, 638, 355 P.3d 667 (2015).

Thus, for purposes of this appeal, Dr. Teply does not dispute that there was a residency supervision rule, which he failed to enforce.

In this case we must also interpret K.S.A. 40-3403(h). Interpretation of K.S.A. 40-3403(h) is a question of law over which this court has unlimited review. *Cady*, 298 Kan. at 734. When a statute is plain and unambiguous, this court does not resort to statutory construction. If a statute is unclear and ambiguous, however, this court may use the canons of statutory construction to construe the Legislature's intent. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016).

*K.S.A. 40-3403(h) Precedent*

To begin our analysis, we must first consider the history of K.S.A. 40-3403(h) and each of the cases that the parties rely on while interpreting K.S.A. 40-3403(h).

11

K.S.A. 40-3403(h) states:

"A health care provider who is qualified for coverage under the fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund. The provisions of this subsection shall apply to all claims filed on or after July 1, 1986."

K.S.A. 2018 Supp. 40-3401(f) defines the term "healthcare provider" to include a "person licensed to practice any branch of the healing arts by the state board of healing arts" and "medical care facilit[ies] licensed by the state of Kansas." The parties do not dispute that the defendants constitute health care providers under the Act. Nor do the parties dispute that the defendants qualify for coverage under the Fund as stated in K.S.A. 40-3403(h). See K.S.A. 40-3403(a) (explaining the specific details of health care providers who qualify for coverage under the Fund). Thus, for purposes of this appeal, the key language of K.S.A. 40-3403(h) is as follows: "A health care provider . . . shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services . . . by any other health care provider . . . ."

In *Bair v. Peck*, 248 Kan. 824, 827-33, 811 P.2d 1176 (1991), our Supreme Court discussed the Legislature's purpose in enacting K.S.A. 40-3403(h):

"[K.S.A. 44-3403] . . . was originally enacted in 1976 to address the perceived medical malpractice crisis, including the problems of obtaining and maintaining affordable malpractice insurance and maintaining the availability of medical services in Kansas. *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 611, 576 P.2d 221 (1978). The history and rationale for the adoption of the Act and other legislation intended to alleviate the 'insurance crisis' and bring about 'tort reform' have been discussed in numerous cases and need not be repeated at length herein. [Citations omitted.] Suffice it to say the Act

12

has not had smooth sailing and has been reviewed, amended, and/or supplemented one or more times during nearly every session of the legislature since its original enactment.

"The legislature has amended and/or supplemented the Act numerous times and has adopted considerable other legislation on the subject of 'tort reform.' However, at the time of the adoption of K.S.A. 1990 Supp. 40-3403(h) in 1986, the desired results had not been realized. . . .

. . . .

"Regarding vicarious liability, the Special Committee [on Medical Malpractice] made the following conclusion and recommendation:

. . . .

'[Recommendation] *Other Insurance Changes*. The bill requires partnerships of persons who are health care providers to obtain the mandatory insurance coverages so that vicarious liability of one health care provider for another may be abolished if both are covered by the Fund. *Further, insurers may exclude from coverage liability for those health care providers already required to maintain professional liability insurance*.' p. 861." (Emphasis added.)

Accordingly, the Legislature enacted subsection (h) to implement tort reform. Subsection (h) achieved tort reform (1) by barring suits based on vicarious liability and (2) by barring suits based on holding one health care provider responsible for the action or inaction of another health care provider who was also covered under the Fund.

Following the *Bair* court's discussion of legislative intent, there have been a handful of Kansas Supreme Court cases interpreting K.S.A. 44-3403(h).

In *McVay*, McVay sued her doctor, as well as the hospital where her doctor had privileges to work, for injuries sustained during a surgery. She settled with the doctor but argued that she still had a valid claim against the hospital under a corporate negligence theory because the hospital negligently granted the doctor privileges when it should have known he was incompetent. The trial court granted the hospital's summary judgment motion under K.S.A. 40-3403(h) and K.S.A. 65-442(b)—a separate statute that bars

13

medical care facilities from being held liable when the negligent doctor is not employed at the medical care facility. McVay appealed, but this court and our Supreme Court affirmed. 255 Kan. at 373-74, 381. Initially, our Supreme Court considered McVay's request to adopt a corporate negligence theory as it relates to hospitals. 255 Kan. at 374-76. It then rejected that request, holding that both K.S.A. 40-3403(h) and K.S.A. 65-442(b) barred McVay from suing the hospital:

> "Whatever reasons may exist for the adoption in Kansas of the corporate negligence theory in regard to hospital liability, we simply do not reach this question. The clear, unambiguous language of K.S.A. 65-442(b) and K.S.A. 40-3403(h) requires the conclusion that those statutes bar McVay's claim against the hospital. McVay's claim is barred by 65-442(b) because her claim is 'because of' [the doctor's] rendering or failure to render professional services. McVay would have no claim against the hospital if [the doctor] had not negligently treated her. Her claim against the hospital is derivative of and dependent upon her claim against [the doctor].
>
> "Similarly, McVay's claim against [the hospital] 'arise[s] out of [the doctor's] rendering of or the failure to render professional services,' so it is barred by K.S.A. 40-3403(h)." 255 Kan. at 377.

In *Lemuz*, the United States District Court for the District of Kansas turned to our Supreme Court for guidance on how to apply K.S.A. 40-3403(h) under the Uniform Certification of Questions of Law Act, K.S.A. 60-3201 et seq. The Lemuzes sued two physicians and the medical center involved in Layton Lemuz' birth; they argued that all three contributed to Layton's birth injuries. The medical center argued that it could not be held liable for the attending physician's negligence under K.S.A. 40-3403(h). But the Lemuzes argued that the hospital was (1) liable for its independently negligent acts and (2) liable under corporate negligence theory because it allowed the attending physician to work on its staff even though the medical center was aware of the attending physician's incompetence. Our Supreme Court relied on *McVay* to hold that the Lemuzes' claim was barred under K.S.A. 40-3403(h):

14

"In *McVay*, this court held that 40-3403(h) applied to and in part prohibited the plaintiff's claim against the hospital, along with 65-442(b), even though the claim was one of independent liability, not just vicarious liability. This conclusion was based on the statutory language which provides that '[a] health care provider . . . shall have no vicarious liability or *responsibility* for any injury or death arising out of . . . .' (Emphasis added.) K.S.A. 40-3403(h). *McVay* interpreted the italicized term above as absolving a hospital not just from vicarious liability but from any responsibility, including independent liability, for the acts of a physician. Under this interpretation, a hospital could not be independently negligent for the injury or death of a patient arising out of the negligence of a nonemployee, independent contractor physician who was covered by the Health Care Stabilization Fund, even if the hospital allowed the physician to continue working on its staff knowing that the physician was incompetent (corporate negligence). Thus, K.S.A. 40-3403(h) does apply and prohibit the plaintiff's claim of corporate negligence against the hospital." 261 Kan. at 940-41.

In *Aldoroty*, Aldoroty sued his three radiologists and the hospital where he worked. Aldoroty himself was a doctor. Each year he participated in the hospital's health audit where he would get a chest X-ray. A radiologist discovered stage IV lymphoma during Aldoroty's annual audit in 1993. Aldoroty asserted that the radiologists who failed to diagnose him with lymphoma at earlier audits were negligent for failing to recognize his cancer sooner. Aldoroty also asserted that the hospital was negligent because it failed to supply the radiologists at the previous audits with his past X-rays for comparison. The radiologists settled with Aldoroty. Yet, the hospital went to trial where Aldoroty prevailed. The hospital appealed, arguing that Aldoroty's negligence claim was barred under K.S.A. 40-3403(h).

Although the *Aldoroty* court reversed for other reasons, it explained why K.S.A. 40-3403(h) did not bar Aldoroty's negligence claim against the hospital. In rejecting the hospital's argument that Aldoroty's case was comparable to the *McVay* case, our Supreme Court stated:

15

"Under the corporate negligence theory, a hospital has an independent duty to its patients to ensure their health by not entrusting the work of health care to an independent contractor/physician who is not competent and careful. Extending staff privileges to an incompetent and careless physician would be a breach of the duty, and the injuries suffered by the patient at the hand of the incompetent and careless physician would be caused by the hospital's breach. This is not vicarious liability for an independent contractor's torts; it is the hospital's liability for its own negligence. Nonetheless, this court rejected the theory on the ground that 'McVay would have no claim against the hospital if [her doctor] had not negligently treated her.' 255 Kan. at 377. This language (rationale) seems to have misled [the hospital] into thinking that something more than the corporate negligence theory was being rejected.

"*McVay* is confined to application to the corporate negligence theory. If applied in circumstances such as those in the present case where several actors allegedly contributed to causing the patient's injury, it negates the legitimate theory of liability. Aldoroty did not seek to hold [the hospital] liable for his physical harm caused by the hospital's negligence in selecting and retaining the radiologists . . . . The duty Aldoroty alleged [the hospital] owed him was to retrieve prior X-rays from storage and furnish them to the radiologists, whose duty it was to compare the present and previous films. [The hospital's] duty and the radiologists' duty were close links in the same small chain, and it was up to the jury to compare their fault. *McVay* is simply inapplicable in the present case. [The hospital] also cites *Lemuz v. Fieser*, 261 Kan. 936, 933 P.2d 134 (1997). It, too, involves the corporate negligence theory and is distinguishable from the present case." 265 Kan. at 681-82.

In *Glassman*, the survivors of a woman who died during a cesarean section sued the nurse anesthetist and obstetrician involved in the procedure. The nurse anesthetist settled with the family, but the obstetrician asserted that K.S.A. 40-3403(h) barred his liability. The family asserted that it was seeking to hold the obstetrician liable for failing to properly communicate with the nurse anesthetist and supervise the administration of anesthesia as required under K.S.A. 65-1158. Below, the trial court agreed with the family. At trial, a jury found the obstetrician partly liable for the woman's death. On appeal, the obstetrician challenged the trial court's decision. Our Supreme Court

16

determined that the issue of comparative fault between the obstetrician and the anesthetist was properly before the jury for the following reason:

> "Based on the clear statement of K.S.A. 65-1158, that when anesthesia is being administered by a nurse anesthetist, we are dealing with a 'physician . . . directed health care team,' we hold the trial court properly allowed the nature and extent of [the obstetrician's] duty of direction, under the circumstances and in light of the individual technical duties of the different health care providers, to be a factual issue for the jury to consider in deciding if he negligently breached his duty." 267 Kan. at 526.

In the more recent *Cady* decision, our Supreme Court synthesized its previous analysis in *McVay*, *Lemuz*, *Aldoroty*, and *Glassman*. Cady sued her obstetrician—Dr. Schroll—and her obstetrician's employer—Women's Care, P.A.—for Dr. Schroll's sexually inappropriate comments and touching during her prenatal care. During discovery, Cady learned that the Board of Healing Arts had previously disciplined Dr. Schroll for "inappropriate and unprofessional behavior with two other patients." 298 Kan. at 733. Based on this discovery, Cady alleged that Women's Care knew about Dr. Schroll's previous discipline. Although Cady eventually settled with Dr. Schroll, Cady argued that Women's Care was "independently liable because it failed to supervise Schroll, failed to prevent him from engaging in inappropriate conduct with her, failed to inform her of Schroll's past disciplinary record, and failed to institute safeguards to prevent Schroll's conduct." 298 Kan. at 733. The trial court granted Women's Care's summary judgment motion, ruling that K.S.A. 40-3403(h) barred Cady's negligence claims. This court affirmed the trial court, and our Supreme Court granted Cady's petition for review. 298 Kan. at 733-34.

Before our Supreme Court, Cady made the following arguments why her independent liability claims were not barred under K.S.A. 40-3403(h):

"(1) *McVay* and *Lemuz* [were] contrary to the language of K.S.A. 40-3403(h) and should be overruled; (2) those decisions [were] distinguishable and should not be applied [to her case; and] (3) the holding and rationale of those decisions was altered by this court's subsequent decisions in *Aldoroty* . . . and *Glassman* . . . . " 298 Kan. at 737-38.

Our Supreme Court rejected each of Cady's arguments why its past caselaw was unsound and why her case was distinguishable.

First, although our Supreme Court agreed that K.S.A. 40-3403(h)'s terms "responsibility" and "arising out of" were unclear and ambiguous, our Supreme Court rejected Cady's argument that the *McVay* and *Lemuz* decisions were contrary to the language of K.S.A. 40-3403(h). Highly summarized, our Supreme Court determined that the term "responsibility" was not modified by the term "vicarious." This meant that the term "responsibility" included any type of responsibility, including "independent liability." 298 Kan. at 739-40, 745. It then determined that the term "arising out of" broadly referred to causation. 298 Kan. at 742-43. Based on those determinations, our Supreme Court reiterated its positions from *McVay* and *Lemuz*, holding "that K.S.A. 40-3403(h) absolves a health care provider not just from vicarious liability *but from any responsibility, including independent liability*, *where the injured party's damages are derivative of and dependent upon the rendering of or the failure to render professional services by another health care provider*." (Emphasis added.) 298 Kan. at 745.

Second, our Supreme Court held that the *McVay* and *Lemuz* cases were not distinguishable from Cady's case. Cady stressed that her case involved a different type of health care provider than the health care provider involved in *McVay* and *Lemuz*; that is, she was suing a physicians group while McVay and Lemuz had sued hospitals. 298 Kan. at 746. Further, Cady stressed that her case did not involve "*claims based on corporate negligence theory rather than on a failure to supervise theory*." (Emphasis added.) 298 Kan. at 746. Yet, our Supreme Court rejected both arguments: "The language of K.S.A.

18

40-3403(h) does not premise immunity on the type of health care providers involved, the nature of the relationship between the two health care providers, or the nature of the theory of liability." 298 Kan. at 746.

Third, our Supreme Court reaffirmed its positions in *Aldoroty* and *Glassman* while rejecting Cady's argument that those decisions overruled the *McVay* and *Lemuz* decisions. Cady argued that the *Aldoroty* and *Glassman* decisions supported her argument that the term "arising out of" included cases of negligent supervision. 298 Kan. at 750. Our Supreme Court reviewed the facts of the *Aldoroty* and *Glassman* cases. It then explained that although K.S.A. 40-3403(h) limited "the bar of liability only to damages arising out of the other health care provider's actions or inactions," the *Aldoroty* and *Glassman* cases demonstrated that there were some situations where two health care providers could have liability under K.S.A. 40-3403(h). 298 Kan. at 749-50. Those situations existed when the two health care providers were negligent while providing medical treatment to a patient:

> "Because both *Aldoroty* and *Glassman* dealt with situations where two health care providers were negligent in providing care and treatment to a patient and the patient's injuries arose from the actions of each provider, those cases present a different situation than *McVay* or *Lemuz*. In *McVay* and *Lemuz*, the injuries arose out of the actions of the physician, and the hospital's liability would have arisen only from the failure to supervise the physician. Given these differences, we reject Cady's argument that *Aldoroty* and *Glassman* altered the holdings in *McVay* and *Lemuz*." 298 Kan. at 753.

In other words, *Aldoroty* and *Glassman* were distinguishable from *McVay* and *Lemuz* because in *Aldoroty* and *Glassman*, there were multiple health care providers that caused the injuries during the patient's treatment, and the "injuries arose from the actions of each provider." Finally, our Supreme Court concluded that Cady's negligence claim against Women's Care was comparable to McVay's negligence claim against the hospital:

19

"[Cady's] claims against Women's Care for negligent supervision are like those asserted in *McVay*, and all of her claimed damages derive from the alleged wrongful acts of Schroll. Paraphrasing what this court said in *McVay*, Cady 'would have [had] no claim against [Women's Care] if she had not been injured' by Schroll, her claim against Women's Care was 'derivative of and dependent upon her claim' against Schroll, and her 'injury arose out of the rendering of professional services' by Schroll." 298 Kan. at 754.

*Judgment on the Pleadings Appropriate*

Turning our focus back to the Browns' arguments, we must next consider the Browns' contention that "[t]his case is about bridging the gap between two distinct lines of analysis present in cases interpreting K.S.A. 40-3403(h)," "corporate negligence cases and non-corporate negligence cases." In their brief, the Browns assert that the *McVay*, *Lemuz*, and *Cady* cases are our Supreme Court's corporate negligence cases. They argue that those cases hold that plaintiffs cannot raise claims against corporations that are derivative of and dependent upon the doctor's rendering of or the failure to render professional services. Yet, they argue that in our Supreme Court's noncorporate negligence cases—*Aldoroty* and *Glassman*—our Supreme Court "allowed for the [health care] providers' fault to be compared because each provider's mistake was independent of the other[]" health care providers' mistake. The Browns allege that the trial court's order granting Dr. Teply's motion for judgment on the pleadings "cannot be reconciled" with the holdings in *Aldoroty* and *Glassman*.

Dr. Teply counters that analysis under K.S.A. 40-3403(h) does not fall under corporate and noncorporate negligence categories. He further asserts that "there is no 'gap' in the case law, no need for this court to 'synthesize' prior cases" "because *Cady* already [synthesized the prior cases analyzing K.S.A. 40-3403(h)]."

Our Supreme Court precedent clearly establishes that Dr. Teply is correct.

20

To begin with, although both McVay and Lemuz sued under a corporate negligence theory, the *McVay* and *Lemuz* courts did not bar McVay's and the Lemuzes' claims against the hospitals based on their theories of liability. Once again, in *McVay*, our Supreme Court explained, "[w]hatever reasons may exist for the adoption in Kansas of the corporate negligence theory in regard to hospital liability, we simply do not reach this question" because the "language of . . . K.S.A. 40-3403(h) requires the conclusion that [the statute bars] McVay's claim against the hospital." *McVay*, 255 Kan. at 377. In *Lemuz*, our Supreme Court adopted the *McVay* court's analysis, holding that the language of K.S.A. 40-3403(h) was broad enough to bar claims of corporate negligence like the Lemuzes' claim. 261 Kan. at 940-42. Consequently, the Browns err by asserting the *McVay* and *Lemuz* courts' analysis on K.S.A. 40-3403(h) hinged on McVay and the Lemuzes suing under corporate negligence.

More important, the Browns err by asserting that the *Cady* case constitutes a case involving corporate negligence. In their brief, the Browns allege that the *Cady* case "exemplif[ies] the corporate negligence approach to applying the Fund statute . . . ." But in *Cady*, Cady attempted to distinguish her case by pointing out that McVay's and the Lemuzes' "claims [were] based on the corporate negligence theory rather than on a failure to supervise theory," like her claim. 298 Kan. at 746. Our Supreme Court explicitly rejected Cady's attempt to distinguish her case:

> "*Nor does K.S.A. 40-3403(h) impose conditions relating to the theory of liability asserted in a petition.* Instead, as we have discussed, *the focus is on the source or cause of the plaintiff's injuries, not on the theory of liability*. In addition, while McVay's claims fell within the scope of the corporate negligence doctrine, this court explicitly declined to reach the question of whether Kansas should adopt the corporate negligence theory because the 'unambiguous language of K.S.A. 65-442(b) and K.S.A. 40-3403(h) requires the conclusion that those statutes bar McVay's claim[s] against the hospital.' *McVay*, 255 Kan. at 377. As we have discussed, this decision was based, at least in part, on the court's focus on causation rather than the nature of the theory. Likewise, in this case we need not

21

determine whether a duty to supervise theory applies in the situation of a licensed physician who is a shareholder of a corporation. Rather, assuming the theory is viable, we must determine if under the facts Women's Care can be liable as a matter of law." (Emphasis added.) 298 Kan. at 747.

Despite the *Cady* court's explicit holding, in their brief, the Browns repeatedly point to our Supreme Court's ruling in *Aldoroty* that "*McVay* is confined to application to the corporate negligence theory" as evidence that a different K.S.A. 40-3403(h) analysis applies depending on whether a plaintiff alleged corporate negligence theory. 265 Kan. at 682. Nevertheless, the Browns further ignore that our Supreme Court rejected this same argument when raised by Cady:

"Cady, in suggesting the Court of Appeals' reading of *Aldoroty* was in error, notes that the *Aldoroty* court distinguished *McVay* and *Lemuz* because they were 'confined to application to the corporate negligence theory.' *Aldoroty*, 265 Kan. at 682. But Cady ignores the reason the *Aldoroty* court felt the distinction was important.

"The *Aldoroty* court noted that the duty alleged in *McVay* was 'to select and retain only competent and careful physicians' and '[t]hat duty arose in a function completely separate from the surgical services provided by the hospital.' *Aldoroty*, 265 Kan. at 682. In contrast, Aldoroty 'did not seek to hold [the hospital] liable for his physical harm caused by the hospital's negligence in selecting and retaining the radiologists' or even its own employees. 265 Kan. at 682. Rather, Aldoroty alleged hospital employees, who were not medical providers required to obtain insurance under the HCPIAA, owed him a duty related to his care and treatment that was independent of the duty owed by the radiologists. And Aldoroty's injuries arose at least in part because the hospital's employees were negligent in caring for him, not just in failing to appropriately retain or supervise an employee or independent contractor. [Citations omitted.]." 298 Kan. at 751-52.

Thus, even though the *Aldoroty* court ruled that the *McVay* decision was limited to corporate negligence theory cases, the *Cady* court limited the precedential value of this ruling. This means that despite the Browns' arguments to the contrary, the *Aldoroty*

court's ruling that "*McVay* is confined to application to the corporate negligence theory" does not support the Browns' contention that courts apply a different K.S.A. 40-3403(h) analysis depending on whether the plaintiff alleges corporate negligence. Indeed, the *Cady* court's decision to distinguish the preceding ruling from *Aldoroty*, as well as the *Cady* court's holding that "K.S.A. 40-3403(h) [does not] impose conditions relating to the theory of liability asserted in a petition," clearly establishes that courts must always use the same analysis—an analysis that focuses on the causation of the plaintiff's injuries—when applying K.S.A. 40-3403(h) to a case.

It is a well-known rule that this court is duty bound to follow our Supreme Court precedent absent some indication that our Supreme Court is departing from its prior position. *Majors v. Hillebrand*, 51 Kan. App. 2d 625, 629-30, 349 P.3d 1283 (2015). Our Supreme Court decided *Cady* in 2014. There is no indication that our Supreme Court is moving away from its holdings in *Cady*. As a result, this court is duty bound to follow the *Cady* court's holding that a plaintiff's theory of liability has no effect on the interpretation and application of K.S.A. 40-3403(h).

Now that we have rejected the Browns' argument about applying K.S.A. 40-3403(h) differently depending on whether the plaintiff alleged corporate negligence, we must now consider whether K.S.A. 40-3403(h) bars the Browns' negligence claim against Dr. Teply under our existing caselaw. As previously discussed in *Cady*, when interpreting the meaning of K.S.A. 40-3403(h), our Supreme Court held that the term "responsibility" includes any responsibility, including "independent liability." Further, the *Cady* court held that the term "arising out of" involves "causation." This statutory analysis resulted in the *Cady* court holding that "K.S.A. 40-3403(h) absolves a health care provider not just from vicarious liability but from any responsibility, including independent liability, if the injured party's damages are derivative of and dependent upon the rendering of or the failure to render professional services by another health care provider." 298 Kan. 731, Syl. ¶ 2.

23

In their reply brief, the Browns argue that they seek to hold Dr. Teply "responsible for his own failure," that is, the failure to ensure the residency supervision rule was enforced. They correctly point out that K.S.A. 40-3403(h) "does not prevent a comparison of fault when each [health care] provider's negligence is independent of the other[]" health care providers' negligence. For this reason, they argue that their case is like the *Aldoroty* and *Glassman* cases. Nevertheless, the Browns ignore that their claim against Dr. Teply hinges on Carter's birth-related injuries, which were all derivative of and dependent upon Dr. Schuchmann's and Dr. Trobough's rendering of or the failure to render professional services. In the cases where our Supreme Court has not prevented a comparison of fault, the health care providers directly contributed to the plaintiff's injuries.

Again, in *Aldoroty*, the radiologists were negligent because they failed to diagnose the lymphoma in Aldoroty's individual chest X-rays. Meanwhile, the hospital was negligent by failing to provide the radiologists with Aldoroty's previous chest X-rays for comparison purposes, lowering his chances at survival. 265 Kan. at 678, 682. Thus, the radiologists and the hospital committed separate acts of negligence, with Aldoroty's injury arising from each act. In *Glassman*, the nurse anesthetist negligently administered anesthesia to Cathy Glassman and the obstetrician failed to comply with K.S.A. 65-1158's rule on supervising the nurse anesthetist. "These factual issues suggested a jury should determine the comparative fault of the two health care providers, both of whom had some active role in causing [Cathy's] death." *Cady*, 298 Kan. at 753 (discussing *Glassman*, 267 Kan. at 523-24, 526).

Yet, in *McVay*, our Supreme Court held that whether the hospital knew about the doctor's surgical incompetence was irrelevant because McVay's claim against the hospital was derivative of and dependent upon her claim against the doctor for the botched surgery. 255 Kan. at 376-78. The *Lemuz* court adopted the reasoning in *McVay* to hold

24

that K.S.A. 40-3403(h) barred recovery against the hospital for negligently hiring the attending physician whose medical services caused Layton's birth injury because the Lemuzes would have no claim against the hospital if the attending physician had not injured Layton. 261 Kan. at 940-41. In *Cady*, our Supreme Court explained: "In *McVay* and *Lemuz*, the injuries arose out of the actions of the physician, and the hospital's liability would have arisen only from *the failure to supervise the physician*." (Emphasis added.) 298 Kan. at 753. Because Cady's negligence claim also involved Women's Care's failure to better oversee Dr. Schroll, the *Cady* court adopted the *McVay* and *Lemuz* courts' analysis to hold that K.S.A. 40-3403(h) barred Cady from recovering against Women's Care. 298 Kan. at 754. The *Cady* court held: "Cady 'would have [had] no claim against [Women's Care] if she had not been injured' by Schroll. [Citation omitted.]" 298 Kan. at 754.

This case is comparable to the *McVay*, *Lemuz*, and *Cady* cases because the Browns would have had no claim against Dr. Teply if Dr. Schuchmann and Dr. Trobough had not injured Carter. Indeed, the Browns' case is very similar to the *Cady* case. Cady sought to hold Women's Care independently liable for Dr. Schroll's sexually inappropriate behavior because it failed to supervise Dr. Schroll, failed to prevent Dr. Schroll from engaging in inappropriate conduct, and failed to institute safeguards to prevent Dr. Schroll's inappropriate conduct. Similarly, the Browns seek to hold Dr. Teply independently liable for Carter's birth injuries based on Dr. Teply's failure to communicate the resident supervision rule as the GME training site director and failure to enforce the resident supervision rule as the GME training site director. In short, the Browns' negligence claim seeks to hold Dr. Teply liable for his failures in a supervisory role. Our Supreme Court rejected this argument in *Cady*. And it did so based on its precedent in *McVay* and *Lemuz*.

In their amended petition, the Browns clearly stated that "[b]ut for [Dr.] Teply's negligence, Carter Brown would not have suffered his birth injuries." It is undisputed that Dr. Schuchmann and Dr. Trobough were the health care providers that directly

25

participated in Katy's labor and Carter's birth. Moreover, in their amended petition, the Browns asserted that if Dr. Trobough had properly monitored Dr. Schuchmann throughout Katy's labor, Carter would not have suffered his birth injuries. Simply put, Carter's birth injuries were caused by Dr. Schuchmann's and Dr. Trobough's medical services during Katy's labor and Carter's delivery. Consequently, Carter's birth injuries "arose out of" the rendering of or the failure to render professional services by Dr. Schuchmann and Dr. Trobough as stated under K.S.A. 40-3403(h).

Thus, it necessarily follows that the Browns' negligence claim against Dr. Teply is derivative of and dependent upon their negligence claims against Dr. Schuchmann and Dr. Trobough for Carter's birth injuries. As a result, K.S.A. 40-3403(h) absolves Dr. Teply from any responsibility relating to Carter's birth injuries because the Browns would have no negligence claim against Dr. Teply if Carter had not been injured by Dr. Schuchmann and Dr. Trobough. In turn, the trial court correctly granted Dr. Teply's motion for judgment on the pleadings, and we affirm.

Because we affirm the trial court's judgment, it is not necessary for us to consider the Browns' second argument involving whether Dr. Teply owed them a legal duty to communicate the residency rule.

Affirmed.